## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

_____

|  |  |  |
|---|---|---|
| | ) | |
| THE CHLORINE INSTITUTE, INC., | ) | |
| THE AMERICAN CHEMISTRY | ) | |
| COUNCIL, THE FERTILIZER | ) | |
| INSTITUTE, ERCO WORLDWIDE | ) | |
| and PVS CHEMICALS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Civil No. 14-cv-01029 (PJS/SER)** |
| v. | ) | |
| | ) | |
| | ) | |
| SOO LINE RAILROAD, d/b/a | ) | **EXPEDITED HANDLING** |
| CANADIAN PACIFIC RAILWAY | ) | **REQUESTED** |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs by their undersigned counsel submit this Memorandum of Points and Authorities in Support of their Motion for Temporary Restraining Order and Preliminary Injunction.

## INTRODUCTION

The new tariff publication of the Canadian Pacific Railway ("CP") is a thinly veiled attempt to avoid that railroad's legal obligation to transport chlorine, anhydrous ammonia, sulphur dioxide and other toxic-inhalation hazard ("TIH") materials. CP has previously stated that it would stop transporting TIH materials if it could, rather than

incur the potential legal liabilities that its own negligent behavior imposes on CP.  By

substantially limiting the rail tank cars available to move TIH materials, CP hopes to

begin the process of eliminating all TIH shipments on its rail lines.  Under the long-

established and uniformly applied federal regulatory structure imposed by the Hazardous

Materials Transportation Act and the Interstate Commerce Commission Termination Act,

CP cannot have its way, and in the final analysis will certainly be prevented from skirting

its legal obligations.  However, since the tariff at issue is scheduled to go into effect on

April 14, 2014, immediate action is required to prevent the obvious and substantial injury

that will affect not only TIH shippers and receivers, but also the public at large.

## FACTUAL BACKGROUND

**1.      Plaintiffs.**

Plaintiff the Chlorine Institute Inc. ("Chlorine Institute") is a Connecticut not-for-

profit corporation with its headquarters at 1300 Wilson Blvd., Arlington, VA 22209.  The

Chlorine Institute is a 200-member trade association of chlor-alkali producers, packagers,

distributors, users and suppliers.  Its mission is the promotion of safety and protection of

human health and the environment in the manufacture, distribution and use of chlorine,

sodium hydroxide, potassium hydroxide and sodium hypochlorite, plus the distribution

and use of hydrogen chloride.  The Chlorine Institute's North American producer

members account for more than 95 percent of the total chlorine production of the United

States, Canada and Mexico.  (Complaint at ¶ 4.)

Plaintiff American Chemistry Council ("ACC") is a New York not-for-profit

corporation with its headquarters at 700 Second Street, NE, Washington, DC 20002.

2

ACC is an industry association that represents America's leading chemical producers. ACC's 130 members account for approximately eighty-five percent of the US capacity for the production of basic chemicals and manufacture a wide array of products, including products designated as TIH, including chlorine and sulphur dioxide. These products, including those designated as TIH, are offered for shipment by railroads including the Canadian Pacific Railway in the United States and Canada. (Complaint at ¶ 5.)

Plaintiff The Fertilizer Institute ("TFI") is a Delaware not-for-profit corporation with its headquarters at 425 Third Street, S.W., Suite 950, Washington, DC 20024. TFI is the national trade association of the fertilizer industry. TFI members rely heavily on rail transportation for the safe and efficient movement of anhydrous ammonia, which is the basic building block required to produce all nitrogen fertilizers. Anhydrous ammonia accounts for more than 45 percent of the TIH materials transported by rail each year, including the Canadian Pacific Railway in the United States and Canada. (Complaint at ¶ 6.)

Plaintiff ERCO Worldwide is a division of Superior Plus LP, a Canadian Limited Partnership with its headquarters located at 302 The East Mall, Suite 200, Toronto, Ontario, Canada. ERCO Worldwide has five manufacturing plants in Canada, two in the United States and one in Chile. ERCO's main business lines are the manufacture and sale of sodium chlorate and the manufacture and sale of chlor-alkali chemicals. ERCO's chlor-alkali business produces chlorine and other chlor-alkali products that serve a variety of industries including municipal and industrial water treatment, food processing,

fertilizers, agricultural intermediates, and oil and gas.  Within the United States, ERCO's

facilities are located at Port Edwards, Wisconsin and Valdosta, Georgia.  ERCO

Worldwide is a member of both the Chlorine Institute, Inc. and the American Chemistry

Council.  ERCO Worldwide ships chlorine on the Canadian Pacific Railway in cars that

are constructed of non-normalized steel and would be affected by the provisions of Tariff

8 that are the subject of this litigation.  (Complaint at ¶ 7.)

Plaintiff PVS Chemicals, Inc. is the parent of PVS Chemical Solutions, Inc. both

located in Detroit, Michigan at 10900 Harper, Detroit, MI 48213.  PVS Chemicals is an

international manufacturer, distributor and marketer of water-treatment and other

chemical products.  PVS ships sulphur dioxide in railcars out of facilities of its supplier,

Teck Metals Ltd. located in Trail, British Columbia.  These shipments originate on the

Canadian Pacific Railway, and are destined for water treatment and other facilities in the

United States and Canada.  Approximately one-third of the PVS railcar fleet is made up

of rail cars constructed of non-normalized steel.  PVS is a member of both the Chlorine

Institute, Inc. and the American Chemistry Council.  (Complaint at ¶ 8.)

## 2.    Defendants.

Defendant Soo Line Railroad Company is a wholly-owned subsidiary of the Soo

Line Corporation.  Both are Minnesota corporations that maintain their principal places

of business in Minneapolis, Minnesota.  Defendant Canadian Pacific Railway (CP) is a

registered trade name under which Soo Line Railroad Company does business.  CP is a

common carrier railroad subject to the jurisdiction of the Surface Transportation Board

("STB").  CP's various rail operations are also subject to the jurisdiction and regulation by the United States Department of Transportation ("DOT").  (Complaint at ¶ 9.)

**3.      Hazard Materials Rail Transportation Regulation.**

      **a.      Rail Tank Car Design Criteria.**

The Federal Hazardous Material Transportation Law (Federal Hazmat Law, 49 U.S.C. § 5101 *et seq.*) authorizes the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate and foreign commerce."  49 U.S.C. § 5103 (b) (1).  The Secretary has delegated this authority to the Pipeline and Hazardous Materials Safety Administration ("PHMSA").  The Hazardous Materials Regulations ("HMR") promulgated by PHMSA are designed, *inter alia,* to ensure that hazardous materials are packaged and handled safely and securely during transportation and to minimize the consequences of an incident should one occur. (Hazardous Materials, 73 Fed. Reg. 17818, 17822 (Proposed Apr. 1, 2008)).

The HMR treat the tank car as a packaging and mandate safety features, permissible materials and methods of construction, as well as inspection and maintenance standards.  A material identified as a hazardous material by the HMR may not be shipped by railroad tank car unless the tank car meets the requirements of the HMR (49 CFR 173.31(a)).

A separate set of standards—the Association of American Railroads ("AAR") Interchange Rules, issued by the AAR's standing Tank Car Committee ("TCC")—govern the tender and acceptance of rail cars among carriers within the general system of railroad

transportation.  The AAR Interchange Rules address a range of design and operational requirements intended to promote uniformity and reciprocity in car handling, including the obligation of rail carriers to perform running repairs on equipment received in interchange.  Historically, the AAR Interchange Rules also have addressed certain subjects, such as rail tank car standards, now covered comprehensively by the HMR.

In carrying out its responsibilities in the area of tank car design and construction, the Secretary through PHMSA relies heavily upon the AAR TCC to provide technical expertise to aid PHMSA in its deliberations and decisions.  "However, final policy judgment lies with DOT, and only DOT is authorized to approve a new tank car specification…." (73 Fed. Reg. 17825.)  The AAR TCC has no authority to determine what railroad tank cars will be accepted via transportation on the rail system as a whole, and certainly no individual railroad has either the authority or color of authority to prescribe what railroad tank cars it will accept for transportation.

        **b.**      **The Common Carrier Obligation.**

In comments dated January 25, 2012, to the Surface Transportation Board in Finance Docket No. 35504, Petition of the Union Pacific Railroad Company for a Declaratory Order, Defendant Canadian Pacific stated "…CP would not participate in the movement of [toxic-inhalation-hazard] TIH if given the choice.  Freight rail carriers, however, generally do not have this choice.  Under the common carrier obligation, rail carriers are required to transport TIH commodities upon reasonable request."  CP correctly interprets the law with respect to its obligations as a franchise monopoly rail carrier.

For more than a century, chlorine and other TIH materials have moved by rail and the Interstate Commerce Commission.  The courts have consistently held that the common carrier obligation now contained in 49 U.S.C. § 11101 requires railroads to accept those materials for transport.  The oft-cited cases of *Akron, C. & Y. R. Co. v. I.C.C.* 611 F.2d 1162 (6th Cir. 1979) and *Consolidated Rail Corp. v. I.C.C.,* 646 F.2d 642 (D.C. Cir. 1981), both stand for the proposition that a railroad may not refuse to accept for transportation a hazardous material when the safety and security of such transportation is regulated by federal agencies.  Both cases involved the transportation of irradiated fuel elements and radioactive waste.  Both cases noted that the transportation of these nuclear materials was a new technology, and the dangers of such transportation were not fully known.  However, the Conrail Senior Vice President for Operations testified before the Interstate Commerce Commission that: "In the event of an accident [involving radioactive materials in rail transit,] the scope and extent of the consequences, expense and damages that could result would be far greater than those involved in transporting any other type of freight."  *Consolidated Rail Corp. v. I.C.C.,* at 644, fn. 4 (bracketed material in the court's opinion).  Notwithstanding the fact that nuclear waste transportation was a new and highly dangerous enterprise, both the I.C.C. and the court held that not only must the railroads carry these materials, but they could not impose special train service requirements beyond those required by DOT and the Nuclear Regulatory Commission.

In Surface Transportation Board ("STB") Docket Ex Parte No. 677 (sub-No.1) (ID# 222852), the North American railroads, led by the AAR, sought to have the STB

7

limit the common carrier obligation with respect to TIH materials claiming that such

materials exposed the railroads to "potential ruinous liability."  In responding to the

railroad petition, the United States Department of Transportation filed a statement in

opposition to the railroad requests.  Specifically, DOT addressed the public benefits of

TIH materials and the essential nature of those materials as well as the need to transport

such materials by rail.  DOT stated:

> Hazardous materials moved by rail include chemicals used to purify water supplies, the weapons and munitions required by the military, fertilizers needed for crop production, and chemicals needed to produce pharmaceuticals, food and everyday products like glass and plastic.  Transporting hazardous materials to their destination in a timely manner is essential to our daily lives.  As an example, timely delivery of chlorine for drinking water systems is critical to the public safety and health, and without the delivery of anhydrous ammonia, an essential fertilizer, agricultural production would plummet.  The need for hazardous materials to support essential services means that the transportation of these materials is unavoidable.

*****

> Railroads carry over 17 million shipments of hazardous materials annually, including millions of tons of explosive, poisonous, corrosive, flammable, and radioactive materials.  Almost 87 percent of these shipments are in tank cars.  Approximately 100,000 carloads of this hazardous material traffic are PIH[1] materials, with chlorine and anhydrous ammonia representing over 78 percent of the PIH traffic.

> The vast majority of PIH offerors ship by rail; indeed, many do not have the infrastructure (loading racks, product transfer facilities) necessary to utilize trucks for such

---

[1] PIH, or "poisonous inhalation hazard," and TIH, or "toxic inhalation hazard," are acronyms used without distinction in all sectors of the transportation industry.

transportation.  Moreover, the current fleet of cargo tank motor vehicles is insufficient to handle a significant shift in PIH cargoes from rail to highway—for example, there are only about 85 cargo tank motor vehicles used for the transportation of chlorine, by contrast there are approximately 5,900 chlorine rail tank cars that engage in 36,470 rail tank car movements of chlorine each year.

CP cannot dispute that railroads have a common carrier obligation to transport chlorine, anhydrous ammonia, sulphur dioxide and other TIH materials.  There is also no disagreement that these TIH materials are essential to modern life in North America and elsewhere.  Further, as will be discussed below, the CP Tariff action involved in this matter was deliberately designed to, and would have the effect of, avoiding the CP common carrier obligation and substantially restraining the movement of essential TIH materials on the CP railroad and on the rail system generally.

c.      **The Effects of the CP Tariff at Issue.**

The effects of the CP tariff publication are substantial and will cause significant irreparable harm to the Plaintiffs.  Frank Reiner, President of the Chlorine Institute, states that the non-normalized rail tank cars that CP would embargo from transportation comprise 21 percent of the chlorine tank car fleet in North America.  (Affidavit of Frank Reiner In Support of Plaintiffs' Motion, Ex. 1 at p. 8.)  Not being able to use those cars on the CP would clearly cause a ripple effect on all chlorine shipments in North America.

Similarly, Dean Larson, President of PVS Solutions, Inc. ("PVS"), avers that the CP tariff publication would cause nearly a third of PVS' rail tank cars to be sidelined, cutting off vital sulphur dioxide shipments in California and thus curtailing the ability of

a major California municipality to effectively treat that municipality's waste water.

(Affidavit of Dean Larson In Support of Plaintiffs' Motion, Ex. 2 at p. 2.)

The Reiner and Larson affidavits are but two examples that demonstrate the

adverse impacts that would be felt almost immediately as a result of the CP tariff actions.

The statement of DOT quoted above demonstrates the vital public and economic

consequences following the imposition of the proposed CP embargo.

## ARGUMENT

The Court should exercise its considerable equitable powers to prevent immediate

and irreparable harm to Plaintiffs by issuing a TRO.  Plaintiffs have satisfied each of the

requirements and Canadian Pacific will not be harmed by an order requiring it to continue

to comply with existing and well-established federal regulations.

### A.      Standard for Obtaining TRO and Temporary Injunctive Relief.

Plaintiffs seek a temporary restraining order under F.R.C.P. 65(b).   When

determining whether to issue temporary injunctive relief, the Court considers four factors:

(1)    Threat of Harm.  The threat of irreparable harm to the moving party;

(2)    Merits.  The likelihood that the moving party will prevail on the
         merits;

(3)    Balance of Harms.  The balance between the harm to the moving
         party if injunctive relief is denied and the injury that may result if the
         injunctive relief is granted; and

(4)    Public Policy.  The effect on the public interest.

Kai v. Ross, 336 F.3d 650, 653 (8th Cir. 2003); Dataphase Sys., Inc. v. CL Sys., Inc., 640

F.2d 109, 114 (8th Cir. 1981).  The focus of a temporary restraining order is on

maintaining the status quo.  Onan Corp. v. United States, 476 F. Supp. 428, 433 n.1 (D.

Minn. 1979).  No single factor is determinative.  Rather, the Court must balance the

relative injuries to the parties and the public.  Dataphase, 640 F.2d at 113.

Injunctive relief is necessary here to maintain the status quo until a trial, because

Plaintiffs stand to suffer irreparable harm if Defendants are not enjoined from their

misconduct.

**B.     Plaintiffs will be Irreparably Harmed if a TRO is not Granted.**

The overriding factor in determining whether injunctive relief should be granted is

whether the moving party is threatened with irreparable harm if the order does not issue.

See Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472-73 (8th Cir. 1994) (finding

preliminary injunction appropriate based on threat of irreparable harm).  Plaintiffs will be

irreparably harmed by CP's new tariff.

"Irreparable harm occurs when a party has no adequate remedy at law, typically

because its injuries cannot be fully compensated through an award of damages."  Gen.

Motors Corp. v Harry Brown's LLC, 563 F.3d 312 (8th Cir. 2009).  Loss of intangible

assets such as goodwill and reputation can constitute irreparable harm.  United

Healthcare Ins. Co. v. Advance PCS, 316 F.3d 737, 741 (8th Cir. 2002).  This Court has

also held that being forced to participate in an illegal contract constitutes irreparable

harm.  Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991).

Finally, a loss of business and profits constitutes irreparable harm where future profits are

difficult to quantify or where the existence of the business is threatened.  Packard

Elevator v. I.C.C., 782 F.2d 112, 115 (8th Cir. 1986) (stating that economic loss

11

constitutes irreparable harm where the loss threatens the existence of the petitioner's business); State of Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975) (finding irreparable injury where "monetary damages, although obvious and doubtless very large, are not susceptible of specific proof").

CP's imposition of its new Tariff 8 will irreparably harm Plaintiffs. Faced with the requirement to ship their product in cars constructed with non-normalized steel, shippers will be forced to forego transporting their product, and receivers will be prevented from obtaining those products.  (See generally Reiner and Larson Affidavits, Ex. 1 and Ex. 2.)

Plaintiffs will be immeasurably harmed if unable to ship their product by rail.  CP is the only rail carrier that services many origins and destinations in North America, and CP is also is the sole carrier providing interchange with other railroads.  Rail is the safest and in many cases the only method of moving TIH materials. (See testimony of DOT in STB Docket Ex Parte 677 (Sub No. 1) quoted at pp. 8 and 9, *supra.*)  The inability to ship product will result in severe economic harm and cause substantial damages to the consumers that rely on those products for vital health, safety, and environmental protection concerns, and vital agricultural uses.

## C. Plaintiffs are Likely to Succeed on the Merits.

In considering this factor, the Court does not decide whether the plaintiff will ultimately win.  PCTV Gold, Inc. v. Speednet, LLC, 508 F.3d 1137 (8th Cir. 2007). Furthermore, the Eighth Circuit has rejected the idea that a "party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits."  Id.

Plaintiffs are likely to succeed on the merits of their claim because CP's conduct is a violation of federal law.  Federal Hazmat Law and the common carrier obligation require railroads to "provide the transportation or service on reasonable request," 49 U.S.C. § 11101(a), and in tank cars that are designed under specifications set forth by the DOT.   Neither the railroads as a group nor an individual railroad like CP are permitted to evade their responsibilities under federal law.  CP's new tariff, however, provides that it will not transport TIH if the tank car does not meet CP's specifications.  Because Plaintiffs' request for transport of their products is reasonable, CP cannot refuse to carry the products, even if the tank cars do not meet CP's unilaterally imposed specifications, which the DOT has rejected.

Plaintiffs request only that CP transport their product in a method that comports with existing federal regulations. The requests are presumptively reasonable.  See Consolidated Rail Corp. v. I.C.C., 646 F.2d 642, 650 (D.C. Cir. 1981) (stating that railroads may seek to prove the reasonableness of additional safety measures, but the burden is on them to show that the presumptively valid federal regulations are unsatisfactory or inadequate).  CP's common carrier obligation requires it "to transport hazardous materials where the appropriate agencies have promulgated comprehensive safety regulations." Union. Pacific R.R. – Pet. For Declaratory Order, FD 35219 (STB served June 11, 2009).  In fact, a railroad may not claim a commodity is too dangerous to transport if there are federal regulations governing such transport, and those regulations have been met.  Akron, Canton & Youngstown R.R. Co. v. I.C.C., 611 F.2d 1162, 1169 (6th Cir. 1979).

CP should transport Plaintiffs' products in cars that meet existing federal regulations.  This request is reasonable under existing, well-established law.  CP's refusal to follow this law violates its common carrier obligation under 49 U.S.C. § 11101(a).  Plaintiffs are therefore likely to succeed on the merits of their claim against CP.

> **D.      Balancing of Harms Weighs in Favor of Granting Injunctive Relief.**

Here, the Court considers the balance between the irreparable harm to Plaintiffs against the potential harm to Defendant.  Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners*, LLC*, 829 F. Supp. 2d 836, 846 (8th Cir. 2011).  This factor weighs in favor of an injunction.

Plaintiffs, as already demonstrated, will suffer irreparable injury without an injunction.  CP, on the other hand, will not suffer any harm from the issuance of a temporary injunction.  It currently transports tank cars made with non-normalized steel.  Furthermore, the DOT already determined that any threat posed by non-normalized steel tank cars was not urgent enough to require immediate turnover of the fleets.  See 74 F.R. 1770, 1785 (Jan. 13, 2009) (codified at 49 CFR Parts 171-174 & 179).

> **E.      Public Policy Favors a Temporary Restraining Order.**

In evaluating the public interest, the Court must consider both what public interests might be injured and what public interests might be served by the requested injunction.  Sierra Club v. U.S. Army Corps of Engineers, 645 F.3d 978, 997-98 (8th Cir.2011).  CP will likely argue that its new standard serves the public interest by increasing safety.  But the DOT already determined that any threat posed by non-

normalized steel tank cars was not urgent enough to require immediate turnover of the fleets.  See 74 F.R. 1770, 1785 (Jan. 13, 2009) (codified at 49 CFR Parts 171-174 & 179).

On the other hand, Plaintiffs' products are essential to national health, safety, security, environmental protection and economic well-being.  If Plaintiffs cannot ship chlorine, for example, the safety of the nation's water-supply will be compromised.  If Plaintiffs cannot ship anhydrous ammonia, the nation's farmers will not have fertilizer for their crops as planting season nears.  If Plaintiffs cannot ship sulphur dioxide, the Nation's municipalities will not be able to properly treat their sewage and waste water.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted.  Defendant should be restrained and enjoined, pending further order of the Court, from implementing and enforcing Tariff 8, Item 55.

Respectfully submitted,

Dated:  April 11, 2014.                    **LARSON • KING, LLP**

By:  s/ Stephen P. Laitinen
Stephen P. Laitinen (#239446)
Jennifer L. Young (#0389950)
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota  55101
Telephone:  (651) 312-6500
Facsimile:  (651) 312-6618
E-mail:  slaitinen@larsonking.com.
         jyoung@larsonking.com.

and

**LAROE, WINN, MOERMAN &
DONOVAN**
Paul M. Donovan (*admitted pro hac vice*)
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Ave, N.W. Suite 200
Washington, DC 20036
Telephone:  (202) 298-8100
Facsimile: (202) 298-8200
E-mail :  paul.donovan@LaroeLaw.com.

*Attorneys for Plaintiffs
The Chlorine Institute, Inc.,
American Chemistry Council,
The Fertilizer Institute, ERCO
Worldwide, and PVS Chemicals*

LK#1398878-v.1

16