UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Chlorine Institute, Inc., The American
Chemistry Council, The Fertilizer Institute,
ERCO Worldwide, and PVS Chemicals,

                Plaintiffs,

   v.

Soo Line Railroad, d/b/a Canadian Pacific
Railway Company,

                Defendant.

Court File No.  14-cv-1029 (PJS/SER)

**MEMORANDUM IN OPPOSITION TO
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

## INTRODUCTION

      Plaintiffs ask this Court to prevent Soo Line Railroad Company d/b/a Canadian

Pacific (CP) from protecting the public from the most dangerous commodities moved by

rail: toxic inhalation hazard (TIH) chemicals. This request for an extraordinary remedy

finds no support in law, in fact, or in common sense. The issues implicated by this

lawsuit are specific to rail transportation and should be decided by the Surface

Transportation Board (STB) – the agency that Congress charged with regulating railroad

services and commerce. The enabling legislation vests the STB with primary jurisdiction

over tariff disputes. Until the STB determines tariff reasonableness, the Court should not

preclude CP from expecting shippers to abide by safety precautions. Regardless of

whether the Court denies plaintiffs' motion because the STB should exercise primary

jurisdiction, the plaintiffs' request for temporary restraining order relief fails on the

merits. The motion should therefore be denied.

## BACKGROUND

### A.    Tank car basics

Tank cars that carry TIH lading fall into four general categories: non-normalized steel cars built before 1989; normalized steel cars built since 1989; interim standard cars built since March 2009; and next generation (NextGen) tank cars, which are currently in testing. Affidavit of Jim Kozey, ¶ 6.

In the event of an accident, normalized steel tank cars are less prone to brittle fractures than non-normalized steel cars. *Id.* ¶ 7. Temperature influences steel brittleness. *Id.* ¶ 9. As the temperature drops, tank steel becomes less ductile and more brittle. *Id*. The temperature at which steel transitions from ductile to brittle is referred to as the "Ductile to Brittle Transition Temperature" (DBTT). *Id.* By lowering the DBTT, normalized steel tank cars remain ductile at colder temperatures, thereby increasing the likelihood that the steel would deform (*i.e.*, bend), rather than rupture (*i.e.*, break). *Id.*

Heat treatment normalizes steel.  Ductile steel deforms before fracturing. *Id.* Hence, in an accident normalized steel tank cars are more likely to retain their contents, and even if the steel ruptures the puncture would likely gradually leak tank contents. *Id*. ¶ 10. In contrast brittle, non-normalized steel cars more readily fracture and are more susceptible to complete separation.  *Id.*  Such ruptures result in the immediate release of a tank car's entire contents. *Id*.

Plaintiffs concede that non-normalized steel tank cars (all of which were constructed at least 25 years ago) are subject to sudden brittle failures and recognize the "desirable" benefits of normalized steel. *See* Affidavit of Frank Reiner at 6-7. But being

allowed to use less "desirable" tank cars saves money. Hence, plaintiffs' TRO request is about lucre, not safety.

In January 2012, the National Transportation Safety Board (NTSB) issued tank car safety recommendations. Affidavit of Michael M. Sawers, Ex. A, at 1 (NTSB Safety Recommendation, Mar. 2, 2012). Those recommendations resulted from a derailment that catastrophically released ethanol. *Id.* The NTSB concluded that "the *inadequate design* of the DOT-111 tank cars, [] made the cars subject to damage and catastrophic loss of hazardous materials[.]" *Id.* (emphasis added). The NTSB went on to note that "DOT-111 tank cars have a high incidence of tank failures during accidents." *Id.* at 2.

Because of the fracture propensity of some tank cars during derailments, the NTSB opined that: "[I]f enhanced tank head and shell puncture-resistance…had been features of the DOT-111 tank cars involved in this accident, the release of hazardous materials likely would have been significantly reduced, mitigating the severity of the accident." *Id.* at 3.  Importantly, the ethanol lading release under NTSB consideration did not involve TIH commodities, and DOT-111 cars are not pressurized.  Accordingly, the NTSB warning about tank-car derailment failures must be taken all the more seriously in the context of TIH-lading transportation at issue in this case.

### B.    Recent train incidents

The public has experienced two catastrophic accidents in the last nine months. While neither incident involved the release of TIH-lading, the accidents brought home why tank car failures during derailments present public safety concerns. On July 6, 2013, a train carrying Bakken-formation North Dakota crude oil derailed. Sawers Aff., Ex. B

(Jad Mouawad, *U.S. and Canada Urge New Safety Rules for Crude Oil Rail Shipments*, New York Times, Jan. 24, 2014, at Sec. B, 2014 WLNR 2103942). The ensuing massive explosion killed forty-seven people and leveled the town of Lac Megantic, Quebec. *Id.* If the cars that carried the crude oil had not failed, the accident would have been much less serious.

On December 30, 2013, just outside of Casselton, North Dakota, an eastbound crude oil train collided with a grain car that had become detached from a westbound train. Sawers Aff., Ex. C (David Shaffer & Evan Ramstad, *NTSB: 400,000 Gallons of Crude Spilled in N.D. Train Wreck*, Minneapolis Star Tribune, Jan. 13, 2014). That collision caused chain reaction explosions. *Id.* Again the oil was carried in tank cars that failed. *See* Sawers, Aff., Ex. D (NTSB Press Release, dated Jan. 23, 2014).

In the aftermath of the Lac Megantic derailment and because safer alternatives were readily available, the Pipeline and Hazardous Materials Safety Administration (PHMSA)—a division of the Department of Transportation—took up the issue of modifying tank car safety standards. If adopted such amendments would decrease the risk of out-dated tank cars rupturing and exploding during rail accidents. *See* Hazardous Materials: Rail Petitions and Recommendations To Improve the Safety of Railroad Tank Car Transportation, 78 Fed. Reg. 54849, 54859 (Sept. 6, 2013) (seeking comment on the requirement that tank car heads and shells be constructed out of normalized steel).

Unfortunately, CP has firsthand experience with the release of TIH lading from non-normalized steel tank cars. In January 2002, a CP train derailed near Minot, North Dakota. Kozey Aff. ¶ 14.  Unlike with the Lac Megantic and Casselton accidents, Minot

4

involved TIH lading. The Minot derailment put 31 cars, five of which suffered catastrophic ruptures, on the ground. *Id.* The tank car failures released almost 150,000 gallons of anhydrous ammonia. *Id.*

If that were not enough, the rupture propelled parts of the non-normalized steel tanks up to 1,200 feet from the derailment site into the adjacent neighborhood. *Id.* The anhydrous ammonia plume extended five miles downwind and resulted in one fatality, eleven serious injuries, 322 minor injuries, and thousands of claims. *Id.* CP was mired in litigation for years. All five of the ruptured tank cars suffered brittle fractures, and one of the tanks experienced both brittle and ductile fractures. *Id.*

Testing conducted by the NTSB  "provide[d] *clear confirmation of the benefit of normalizing steel*." Kozey Aff. ¶ 15 (emphasis added). The NTSB determined that the DBTT of normalized steel was "at least 72 degrees F below the DBTT of the non-normalized" steel samples. *Id.* Based on those findings, the NTSB concluded that "the low fracture toughness of the non-normalized steels used for the tank shells of the five tank cars that catastrophically failed in this accident contributed to the cars' complete fracture and separation." *Id.* Because of the increased potential for injurious releases, the NTSB warned that the continued use of non-normalized steel for the movement of TIH lading "poses an unquantified but real risk to the public." *Id.* ¶ 16.

Tank-car failures during rail accidents are not limited to the recent Bakken crude and Minot TIH lading disasters. On January 6, 2005, a Norfolk Southern train carrying chlorine (a TIH product) in non-normalized steel tank cars derailed in Graniteville, South

Carolina. That accident caused nine deaths and over 500 respiratory injuries.[1] On June 19, 2009, a Canadian National train transporting ethanol derailed. The contents of a failed tank car burst into flames, causing one death and three serious injuries.[2]

### C.      Tariff 8, Item 55

Not willing to expose the public to unnecessary peril or to take the risk of a TIH-lading catastrophe, on March 12, 2014, CP notified shippers that Item 55 would be added to Tariff 8. The tariff modification was intended to enhance safety for the carriage of the most dangerous products—namely TIH commodities[3]—that move by rail. Affidavit of Glen Wilson, Ex. A (March 12, 2014 e-mail from Canadian Pacific, publishing Item 55 to shippers);[4] Compl. Ex. A (Tariff 8). TIH materials include anhydrous ammonia, sulfur dioxide, and chlorine. *See* Tariff 8, Item 56 (defining TIH products). Because of railroad common carrier obligation[5] CP has no choice about transporting TIH commodities tendered by a shipper. Item 55 merely requires that dangerous lading be contained in tank cars incorporating technology that has been available for more than 25 years.

---

[1]      A report on the NTSB website details the circumstances of the derailment. The NTSB's Graniteville Report is available at www.ntsb.gov/doclib/reports/2005/RAR0504.pdf.

[2]      The NTSB's Cherry Valley Report is available at www.ntsb.gov/doclib/reports/2012/RAR1201.pdf.

[3]      The railroad industry and railroad regulators use "toxic inhalation hazard" and "poison inhalation hazard" interchangeably. *See* CP Tariff 8, Item 2.

[4]      After being published, CP revised Tariff 8 to remove a requirement that shippers certify their entire fleet to contain compliant normalized cars. *Compare* Wilson Aff., Ex. A *with* Compl. Ex. A.

[5]      By statute, the "common carrier" obligation requires railroads to provide service on reasonable request. 40 U.S.C. § 11101. Common carriers must publish reasonable rates and terms of service for the movement of all commodities and must carry TIH lading tendered by shippers. *Id.*

Item 55 provides:

> Tank cars constructed of ASTM A516 or TC128 steels tendered to CP for the transportation of TIH (refer item 56) must be normalized and meet the requirements of Chapter 2 - Paragraph 2.2.1.1 of the Association of American Railroads (AAR) Manual of Standards and Recommended Practices, Section C Part III, Specifications for Tank Cars (M-1002). Shipper shall be responsible for ensuring that its cars moving on CP meet the foregoing standard.

This provision requires shippers to tender TIH lading in tank cars constructed from normalized steel. *Id.*

Neither Tariff 8 nor any other term of carriage exempts CP from the obligation to haul TIH lading. Instead, because of the extremely hazardous nature of TIH products and potentially devastating consequences of a TIH-lading release, CP promulgated Item 55 to promote transportation safety. Wilson Aff., ¶ 13. A TIH lading accident in the Twin Cities, especially near the Mississippi River, could have catastrophic effects for Minnesota and potentially for the entire nation.

### D. Plaintiffs' tank car fleet and reaction to Item 55

PVS leases 100 tank cars, 31 of which are made of non-normalized steel. *See* Affidavit of Dean Larson, at 2. Accordingly, PVS has 69 cars available to ship TIH ladings on CP. *Id.*

ERCO has a total of 193 chlorine tank cars. Wilson Aff., ¶ 16. Of that number, 112 are constructed out of normalized steel, and 79 are constructed out of non-normalized steel. *Id.* Two of ERCO's tank cars meet interim standards, which incorporate more

advanced safety measures.[6] *Id.* Hence, ERCO has plenty of cars available that can carry chlorine over CP's railroad.

Similarly, the President of the Chlorine Institute represents that only 21% of his members TIH-lading fleets are construed out of non-normalized steel. *See* Reiner Aff., at 8. This means Institute members have 79% of the chlorine hauling fleet--or – or 4,150 normalized-steel tank cars – available for TIH-lading shipments on CP. *Id.*

## ARGUMENT

Plaintiffs' TRO motion seeks an extraordinary judicial remedy but overlooks a simple reality: the resolution of tariff disputes is committed to the primary jurisdiction of the STB. Congress delegated rail commerce regulation to the STB. Accordingly, this challenge to the rates and terms upon which CP will carry TIH lading belongs before the administrative agency with the expertise and the national perspective to address Item 55 ramifications. Alternatively, the Court should defer a ruling on this issue to the responsible Canadian tribunal. A Canadian decision would be appropriate because CP would only refuse a shipper's direct tender of a non-normalized-steel tank car in Canada.

Regardless of whether the Court sends this case to the STB or to a Canadian tribunal, the plaintiffs have not carried the heavy burden of establishing temporary restraining order necessity. The proponents of less-safe tank cars can neither show that

---

[6]     "Interim" cars are an improvement over normalized steel cars. Kozey Aff., ¶ 21. But CP at this time is not insisting that TIH lading be shipped in the state-of-the-art, most expensive tank cars available. *See* Item 55. Rather, CP seeks to enhance safety by keeping TIH-lading tank cars that are 25 years or older off CP's rails. Requiring TIH-lading shippers to use readily available normalized steel cars promotes public safety and does not unduly burden TIH-lading shippers. *Id.*

they would suffer irreparable harm nor that they will likely succeed on the merits. If that were not enough, the balance of harms and public interest weigh heavily against a TRO that would condone the transport of the most dangerous commodities moving over the rails in less-safe tank cars.

## I.   Deference to the appropriate agency

The relief sought by the complaint is not for this Court to give. The Commerce Clause of the Constitution (Art. 1, sec. 8, cl. 3) empowers Congress to legislate regarding interstate commerce. *Gibbons v. Ogden*, 9 Wheat 1, 196 (1824). Congress and the courts have long recognized the need for nationally-uniform railroad regulation. *Burlington N. R. Co. v. State of Minn.*, 882 F.2d 1349, 1352 (8th Cir. 1989).

In furtherance of that purpose, Congress has so legislated. The Interstate Commerce Act (ICA), as amended by the Interstate Commerce Commission Termination Act (ICCTA), is "among the most pervasive and comprehensive of federal regulatory schemes." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co*., 450 U.S. 311, 318 (1981); *accord Deford v. Soo Line R.R.*, 867 F.2d 1080, 1088-91 (8th Cir. 1989) (federal law so pervasively occupies the field of railroad regulation that ICA and ICCTA completely preempt state-law railroad-commerce claims).

To oversee interstate rail commerce, Congress created the STB. That agency resolves disputes involving railroad tariffs, practices, and rates. 49 U.S.C. § 10501(b) (describing the STB's jurisdiction). Despite the availability of an STB forum, plaintiffs' Item 55 challenge fails to exhaust requisite administrative remedies; instead, plaintiffs have prematurely sought judicial review. Notably, the STB can issue emergency orders,

including injunctions—the very relief requested by this motion. 49 U.S.C. § 721(b)(4) (allowing the STB to bypass procedural requirements of the Administrative Procedure Act in order to avoid irreparable harm).

## A.     The Court should yield to STB primary jurisdiction

With ICCTA, Congress replaced the Interstate Commerce Commission (ICC) with the STB and gave the new agency authority over rail commerce and regulation. STB oversight prerogative extends to:

> (1)     transportation by rail carriers and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers.

49 U.S.C. § 10501(b).

Section 10501(b) leaves no room for judicially-crafted remedies when "rates, classification, rules, [and] practices for transportation by rail" are at issue. *Id*. The courts have accordingly recognized that "[i]t is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581-84 (N.D. Ga. 1996).

Because of the STB's almost-complete authority over and special expertise regarding railroads, the judiciary routinely declines to decide claims that would encroach upon the congressionally-mandated administrative regime. *See, e.g., Assoc. of Am. R.R.s v. S. Coast Air Quality Mgmt.*, 622 F.3d 1094 (9th Cir. 2010) (ICCTA preempts air quality rules); *Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444 (D.C. Cir. 2010) (ICCTA preempts antitrust claims).

10

When confronted with claims that implicate STB authority, courts typically invoke the primary jurisdiction doctrine and refer such disputes to the agency. *See*, *e.g.*, *DeBruce Grain, Inc. v. Union Pac. R. Co.*, 149 F.3d 787, 789-90 (8th Cir. 1998) (affirming dismissal without prejudice and referral to STB under primary jurisdiction doctrine). Judicial respect for agency primary jurisdiction maintains the proper relationship (and promotes coordination) between the courts and administrative authorities charged with regulatory responsibilities and armed with specialized expertise. *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 62-64 (1956).

The doctrine enables judges "to allocate between courts and agencies the initial responsibility for resolving issues and disputes in a manner that recognizes the differing responsibilities and comparative advantages of agencies and courts." 2 Richard J. Pierce, Jr., Administrative Law Treatise, § 14.1, at 918 (4th ed. 2002). The primary jurisdiction doctrine emanates from separation of powers and comity considerations and recognizes that agencies are often better equipped to decide regulated commerce disputes because of those tribunals' "specialization, [] insight gained through experience, and [] more flexible procedure." *Far E. Conference v. United States*, 342 U.S. 570, 574-75 (1952).

While "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," several considerations in this case support agency deference. *W. Pac.*, 352 U.S. at 64. The first consideration is the extent to which specialized expertise makes the administrative process a more preferable forum. *Far E. Conference*, 342 U.S. at 574. Specialized knowledge is particularly relevant when the controversy involves economic relations among stakeholders in a regulated industry and facts peculiar to that business and its

11

history. *Id.* at 573. Because this case turns on rail transportation regulation and tank car construction complexity, STB deferral becomes the obvious choice. Unlike this Court, the STB routinely deals with the terms upon which rail transportation is conducted and the movement of dangerous commodities by rail. Specifically, STB and STB-related entities have studied TIH-lading tank car safety for decades.

The need for regulatory uniformity and the importance of avoiding judicial interference with the conduct of agency duties further supports administrative decision making. *W. Pac.*, 352 U.S. at 64; *Roedler v. United States Dep't of Energy*, No. Civ. 98-1843 (DWF/AJB) 1999 WL 1627346, at *16 (D. Minn. Dec. 23, 1999) ("[P]romotion of uniformity in statutory and regulatory construction" are among the reasons for the doctrine), *aff'd on other grounds*, 255 F.3d 1347 (Fed. Cir. 2001). Even when agency fact findings may ultimately "serve as a premise for legal consequences to be judicially defined" courts defer to administrative expertise. *Far E. Conference*, 342 U.S. at 574.

Common carrier status obligates CP to provide "service" on TIH-commodity shippers' request, and the appropriateness of CP's response to such requests is what STB primary jurisdiction is about. *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit, Corp.*, 130 S. Ct. 2433, 2441 (2010) (citing § 11101).

The adoption and enforcement of Item 55, which provides "Tank cars…tendered to CP for the transportation of TIH…must be normalized" is manifestly within STB expertise and prerogative.  The question whether CP should be required to diminish safety standards in order to accommodate a small percentage of the TIH-lading fleet as well as shipper bottom lines and thus modify the terms upon which rail transportation

services are provided, is for the STB to answer. Similarly, the STB has primary jurisdiction to decide the reasonableness of the shipper requests for TIH-lading transportation services in non-normalized tank cars. *Kawasaki*, 130 S. Ct. at 2441.

The Court should decline to issue a temporary restraining order and, instead, should refer resolution of this tariff dispute to the STB. *Pejepscot Indus. Park, Inc. v. Me. Cent. R. Co.*, 215 F.3d 195, 205-06 (1st Cir. 2000) ("We conclude that the district court should stay Grimmel's ICCTA claim while referring it to the STB. First, the STB's expertise is clearly involved in the question of whether Guilford's actions constitute an unlawful refusal to 'provide…service on reasonable request'…[and] referral to the STB will promote uniformity in the standards governing refusals to provide service." (citations omitted)).

Plaintiffs' request for "expedited" relief could have easily been brought before the STB, and in the appropriate case the agency could issue an emergency, injunctive remedy. *See* 49 U.S.C. § 721(b)(4) ("The [STB] may…(4) when necessary to prevent irreparable harm, issue an appropriate order without regard to [the Administrative Procedure Act]."); *see also DeBruce Grain, Inc. v. Union Pac. R.R. Co.*, 983 F. Supp. 1280, 1283 (W.D. Mo. 1997); *DeBruce Grain, Inc. v. Union Pac. R.R. Co.*, STB Docket No. 42023, 2 S.T.B. 773, 1997 WL 781276, at *2-3 (S.T.B. Apr. 21, 1998). The Court should decline to grant emergency relief when the STB has the authority and expertise to decide claim propriety and to issue appropriate relief.

By bypassing the STB, plaintiffs hope to circumvent the congressional mandate for the administrative resolutions of railroad rates and terms of service reasonableness.

Thus while, as demonstrated below, plaintiffs' TRO fire drill-request fails on the merits, for the reason of primary STB jurisdiction alone the Court should deny the motion because Congress made the STB responsible for deciding this type of dispute.

### B.     Plaintiffs have not exhausted administrative remedies

Plaintiffs' complaint contains two substantive causes of action: one count arising under the Hazardous Materials Transportation Act (HMTA) (Compl. ¶¶ 30-33), and another accusing CP of violating common carrier obligations (Compl. ¶¶ 34-37). Both counts require exhaustion of administrative remedies before seeking review from the courts.  Plaintiffs' failure to do so requires deference to the appropriate agencies.

First, the HMTA does not afford a private cause of action, but instead calls for the Department of Transportation (DOT) enforcement. Hence, a TRO cannot be granted to vindicate a claim that plaintiffs do not have. And even if plaintiffs could enforce laws delegated to the DOT, they must exhaust administrative remedies before seeking judicial review.

When Congress provides no remedy, the federal statutory violation does not confer a private cause of action on allegedly-harmed individuals. *Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979) ("[T]he mere fact that the statue was designed to protect advisers' clients does not require the implication of a private cause of action for damages on their behalf."); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). The HMTA unquestionably does not create a private right of action. *See*, *e.g.*, *Casey-Beich v. U. Parcel Serv., Inc.*, 295 Fed. Appx. 92, 94 (7th Cir. 2008) ("But these regulations cannot establish federal question jurisdiction because neither these

14

regulations, nor their enabling legislation, the [HMTA], provide a private right of action."); *Borough of Ridgefield v. N.Y. Susquehanna & W. R.R.*, 810 F.2d 57, 59-61 (3d Cir. 1987) (applying *Cort v. Ash*, 422 U.S. 66, 78 (1975) to determine that the HMTA creates no private right of action; instead, "Congress enacted the HMTA to vest the Secretary of Transportation with the authority necessary to coordinate federal efforts in the regulation of hazardous materials' transportation"); *Waering v. BASF Corp.*, 146 F. Supp. 2d 675, 682 (M.D. Pa. 2001) (citing 49 U.S.C. §§ 5103, 5121-23 and concluding "[T]he HMTA itself did not create any private right of action, merely authorizing regulatory action and civil actions initiated by the Secretary of Transportation").

Instead of empowering a private plaintiff to sue, the HMTA vests the Secretary of Transportation with enforcement authority. 49 U.S.C. § 5103(a) ("The secretary shall designate…"); § 5103(b) ("The secretary shall prescribe regulations…"). The statute authorizes the Attorney General, at the DOT's request, to bring HMTA enforcement actions. 49 U.S.C. § 5122(a). Since the HMTA does not enable plaintiffs to assert a private cause of action, the STB, which has jurisdiction over rail commerce, must decide the propriety of CP's tariff. This Court lacks the prerogative and expertise to usurp that administrative function.

In that same vein, the ICCTA requires a putative plaintiff to abide by STB rules and regulations in bringing railroad-common-carrier obligation claims, like raised in plaintiffs' complaint. 49 U.S.C. § 11701; § 11101(f); *see also* Compl. ¶¶ 34-37. A prerequisite to judicial review is exhaustion of STB administrative remedies. *Kessler v. Surface Transp. Bd.*, 637 F.3d 369, 372-73 (D.C. Cir. 2011) (citing various HMTA

15

provisions). As the *Kessler* court explained, the STB may investigate a railroad's violation of common carrier duties "on complaint," in accordance with the STB procedures "prescribing the form and manner in which the complaint must be filed." *Id.* (footnote omitted) (citing 49 U.S.C. § 11701; *Chicago & Nw. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321-23 ("Congress intended that an aggrieved shipper should seek relief in the first instance from the Commission.")). Thus the Court should require plaintiffs to comply with STB rules and regulations before asking for judicial relief.

## C.    Deferring to Canada

Alternatively, the Court should defer the issues to the appropriate Canadian tribunal for resolution. Like the STB, the Canadian Transportation Agency (CTA) oversees the provision of rail service in that country. *See* Canada Transportation Act, S.C. 1996, c. 10 (last amended June 26, 2013), ¶ 112 ("A rate or condition of service established by the Agency under this Division must be commercially fair and reasonable to all parties."); ¶ 113 ("A railway company shall, according to its powers, in respect of a railway owned or operated by it, (a) furnish, at the point of origin…adequate and suitable accommodation for the receiving and loading of all traffic offered for carriage on the railway…").

And as with the STB, the CTA investigates complaints about railroad service obligation failures. *Id.* at ¶ 116 ("On receipt of a complaint made by any person that a railway company is not fulfilling any of its service obligations, the Agency shall (a) conduct, as expeditiously as possible, an investigation of the complaint[]; and (b) within

one hundred and twenty days…determine whether the company is fulfilling that obligation.").

Shippers would not tender non-normalized steel tank cars loaded with TIH commodities to CP in the United States: CP only directly deals with TIH-commodity shippers in Canada. Out of comity and respect for Canadian sovereignty and recognizing that this issue has more Canadian than American ramifications, the Court should allow the Canadian regulators to determine whether Item 55 complies with Canadian law. *See Dow Jones & Co. v. Harrods, Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (in assessing declaratory judgment jurisdiction courts should consider "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court[.]").

## II.   The TRO motion fails on the merits

Even if this Court were to decide this motion, plaintiffs' TRO quest fails before it begins. A TRO is a drastic remedy that should be used in only the most extreme circumstances. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). To secure TRO relief, plaintiffs must carry a heavy burden. *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993). Courts "pay particular regard for the public consequences" in considering extraordinary remedy requests. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). The balance of equities must "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys. Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Plaintiffs' motion turns that status quo principle on its head: Item 55 went into

effect on April 14, 2014; hence, the Item 55 status quo only allows plaintiffs to ship TIH lading on CP in normalized-steel tank cars. *See* Wilson Aff., Ex. A (email announcing Item 55). By this motion, plaintiffs hope to *change* rather than preserve the status quo.[7]

In deciding equitable relief, the Court considers four factors: (1) the threat of irreparable harm; (2) the balance between harm to the movant and the injury that granting the injunction would inflict on other parties; (3) the probability of success on the merits; and (4) the public interest. *Dataphase*, 640 F.2d at 114.

Courts deny injunctive relief as a matter of course when a plaintiff fails to establish irreparable harm or a likelihood of success. *See Dataphase*, 640 F.2d at 114 n.9. "If a plaintiff's legal theory has no likelihood of success on the merits, preliminary injunctive relief must be denied." *Newton County Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 113 (8th Cir. 1997) (failure to establish likelihood of success doomed request for injunctive relief); *see also Mason v. Minn. State High Sch. League*, No. 03-6462, 2003 WL 23109685, *3 (D. Minn. Dec. 30, 2003) ("Plaintiff's failure to prove a likelihood of success on the merits of their claims is fatal to their claim of irreparable harm."); *Inter-Tel, Inc. v. CA Commc'ns, Inc.*, No. 02-1864, 2002 WL 1949748, *2 (D.

---

[7]    On March 12, 2014 CP notified to shippers that Item 55 would become effective on April 14, 2014. Wilson Aff., Ex. A. On March 27 at least one Chlorine Institute member objected. Wilson Aff., Ex. C. Plaintiffs could have been significantly more diligent in seeking tariff implementation relief. Because of public safety concerns, CP never agreed to delay Item 55. Thus plaintiffs' lackadaisical approach must be regarded as evidence that Item 55 is not as onerous as plaintiffs want this Court to believe. And the failure of plaintiffs' "the sky will fall" predictions to come to fruition belies their irreparable harm contentions.

Minn. July 31, 2002) ("[a]bsent a showing of likelihood of success on the merits, [the movant] is not entitled to a temporary restraining order").

Each of the four *Dataphase* factors weighs against the extraordinary remedy that plaintiffs seek. The Court should therefore dispose of this motion.

### A.    No irreparable harm

When money damages can compensate a party for any injury that might be inflicted, the courts do not grant TRO relief. *Packard Elevator Co. v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) (quoting *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 673 (D.C. Cir. 1985)) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of petitioner's business." (internal quotations omitted)); *Graham Webb Int'l v. Helen Curtis, Inc.*, 17 F. Supp. 2d 919, 924 (D. Minn. 1998) ("Plaintiff must first establish that irreparable harm will result without injunctive relief and that such harm will not be compensable by money damages."). Failure to prove irreparable harm alone is "sufficient to deny a preliminary injunction." *Id.* (citing *Gelco Crop v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1984)). Plaintiffs cannot demonstrate harm aside from monetary damage, resulting from increased shipping costs or lost sales. Neither of those injuries constitutes irreparable harm.

Plaintiffs accuse CP of "substantially limiting the rail tank cars available to move TIH materials." Pls.' Br. at 2. Plaintiffs' own submissions, however, demonstrate that CP would only refuse to carry about 20% of the available tank cars in the TIH-lading fleet. Reiner Aff., at 9. And even though 20% of the TIH lading fleet are constructed of non-normalized steel, approximately 95% of TIH commodity movements on CP are in

normalized steel tank cars. Wilson, Aff., ¶ 16. And shippers could use the non-normalized steel tank cars to ship non-TIH commodities or move TIH lading in non-normalized steel tank cars on other railroads. Plaintiffs could also attempt to lease or purchase compliant tank cars from owners or sublease normalized steel tank cars from other shippers. Alternatively, plaintiff could classify shipments to ensure that only normalized steel tank cars are tendered to CP. Plaintiffs make no showing that such attempts have been made or are not possible.

Importantly, the irreparable harm at issue must be to the *movant*. *See*, *e.g.*, *Dataphase*, 640 F.2d at 114. Plaintiffs' worry that their "inability to ship product will result in severe economic harm and cause substantial damages to [] *consumers*." Pls.' Br. at 12; *see also* Compl. ¶ 39 ("[S]hippers *and receivers* of TIH...will suffer immediate and significant and irreparable injury[.]"). Such concern is misplaced. Speculative harm to third parties or the public does not constitute irreparable harm to plaintiffs that would warrant TRO relief. If third parties stand to suffer irreparable harm those parties must come forward and complain for themselves against Item 55.

Underscoring the lack of harm to plaintiffs is the ready availability of normalized tank cars in the various TIH lading shipper fleets. Approximately 70% of PVS's fleet, well over half of ERCO's fleet, and nearly 80% of Chlorine Institute member fleets satisfy Item 55 standards. Larson Aff., at 2; Reiner Aff. at 8. Wilson Aff., ¶ 16. Given the availability of normalized steel tank cars, plaintiffs could avoid any adverse Item 55 effects by simply loading TIH lading for shipment on CP into tank cars that CP will

accept. Plaintiffs would thus emerge from the strictures of Item 55 completely unharmed, but to be sure, public safety would benefit.

Besides that, to the extent plaintiffs would suffer injury, that harm could be cured with money damages. In fact, one shipper has already purported to quantify the financial harm that would allegedly be inflicted by CP's refusal to move TIH lading in non-normalized steel cars. *See* Wilson Aff., Ex. B. Lost profits and extra costs are not irreparable because this Court could order CP to compensate shippers for any foregone revenue. Likewise, if plaintiffs were forced to default on existing contracts, pay penalties, or lease new cars, those amounts could be remedied by a monetary award. Even if plaintiffs were required to pay higher operational costs, such as overtime or normalized-steel tank cars lease premiums, nothing would be irreparable. In sum, plaintiffs have offered no argument much less evidence to support a showing of irreparable harms. This failure of proof forecloses plaintiffs' request for emergency relief.

### B.    No likelihood of success

Plaintiffs are equally unable to satisfy the second *Dataphase* factor. The attack on Item 55 fails where this tariff dispute belongs, before the STB, as well in this Court. As an initial matter, being in the wrong forum dooms plaintiffs' case. But without regard to primary jurisdiction, the TRO reach should be turned back for several reasons.

First, federal law empowers CP to set tariffs. Those terms and conditions of carriage are proper when they address, among other things, safety, operational, or equipment issues. Because Item 55 falls with CP's discretion, subject to STB invalidation or modification, plaintiffs cannot succeed on the merits. Second, to the extent Item 55

exceeds federal standards, that more exacting requirements contravenes no law. The federal regulations only set minimum standards. *Akron, Canton & Youngstown R.R. Co. v. I.C.C.*, 611 F.2d 1162, 1169 (6th Cir. 1979) (acknowledging a railroad's ability to exceed minimum standards under certain circumstances). *See e.g.* 49 C.F.R. § 213.1. No law prevents CP from doing more in the interest of public safety. Third, Item 55 does not violate railroad common carrier obligations; instead, the enhanced tank car safety standard addresses real and imminent concerns. And fourth, plaintiffs' demand to ship TIH lading in less-safe tank cars is neither reasonable nor responsible. For these distinct reasons, plaintiffs cannot demonstrate a likelihood of success.

### 1.    *CP has authority to promulgate tariffs*

As authorized by Congress, CP publishes terms for the carriage of various cargos. *See*, *e.g.*, 49 U.S.C. § 10702 ("A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall establish reasonable – (1) rates, to the extent required by section 10707, divisions of joint rates, and classifications for transportation and service it may provide under this part; and (2) rules and practices on matters related to that transportation or service."). The industry refers to the conditions and prices that govern rail transportation services as "tariffs."

Through published tariffs and other measures, CP consistently strives to maximize safety. Wilson Aff. ¶¶ 4-6. For the last eight consecutive years, CP has achieved the lowest accident rate in the industry. Wilson Aff., ¶ 6. Despite this record, CP continues to do everything within the railroad's power to make rail transportation safer. *Id*. ¶ 6. Tariff

8 and Item 55 focuses on TIH-lading shipments because even a relatively small amount of a TIH commodity in the air or water could be lethal. *Id.* ¶ 2.

CP has seen firsthand that the transportation of TIH commodities, such as chlorine and anhydrous ammonia, can have catastrophic consequences. Derailments like those in Minot and Graniteville may be rare, but those two incidents killed several people, caused millions of dollars of property damage, and wreaked environmental havoc. Accordingly, CP promulgated Item 55 to protect the railroad employees, shippers, and the public from the consequences of a future TIH-commodity incident. Wilson Aff. ¶ 12-13. No one can guarantee that a TIH lading accident will never happen, but requiring plaintiffs to ship TIH lading in safer tank cars diminishes the likelihood of ruinous mishap effects, regardless of fault.

49 U.S.C. § 10702 authorizes CP to set tariffs. Absent a proper and successful STB challenge, tariffs are presumptively valid and enforceable. 49 U.S.C. § 11701 (requiring a shipper to file administrative complaint to initiate STB tariff reasonableness determination). Notably, when reasonableness of a published rate is in dispute, courts should not disturb the carrier's tariff while the agency, with jurisdiction, decides reasonableness. *Burlington N., Inc. v. United States*, 459 U.S. 131, 141-42 (1982) (citation omitted) ("[W]here there is a dispute about the appropriate rate, the equities favor allowing the carrier's rate to control pending decision by the [ICC]…").

The *Burlington Northern* Court dealt with a challenge to coal carriage rates, but courts understand that the rate charged can only be understood in the context of the services rendered in exchange for those rates. *See AT&T Co. v. Cent. Office Telephone,*

*Inc.*, 524 U.S. 214, 223 (1998) ("Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached.").

Even if plaintiffs sought STB review, basic administrative law principles would leave the tariff in place pending the resolution of the dispute. Because plaintiffs have failed to seek administrative relief against Item 55, the tariff should remain valid and enforceable until the STB decides, if ever, otherwise.

2.    *Item 55 does not violate common carrier obligation*

A common carrier may not flatly disavow the obligation to haul materials deemed to be "absolutely too dangerous to transport." *Union Pacific Dec. Order*, 2009 WL 1630587, at *2 (citing *Akron,* 611 F.2d at 1169). Similarly, a railroad may not refuse service because accommodating a shipper would be "inconvenient or unprofitable." *GS Roofing Prods. Co. v. Surface Transp. Bd.*, 143 F.3d 387, 391 (8th Cir. 1998). The common carrier obligation limits railroad choices about the provisions of services, but the STB distinguishes between an outright refusal to carry a shipment under any circumstances—which is not at issue in this case—and the imposition of additional safety and security measures. *See Union Pacific Dec Order* at *2, *4.

CP has not refused to provide TIH lading service. Item 55 does not constitute a categorical ban against the carriage of chlorine or any other TIH commodity.  As a result, the safer tank car requirement does not violate CP common carrier duties.

Even if the Court were to consider Item 55's conditions of service a *de facto* refusal, such refusal is not based on convenience or profitability. Rather, CP published

Item 55 in response to the urgent need to address safety concerns associated with the movement of TIH-lading. Wilson Aff. ¶ 12-13.

3.   *Item 55 complies with government minimum standards*

Plaintiffs' assertion that Item 55 contravenes the DOT's standards for carriage of TIH lading lacks support. *See* Compl. ¶ 31-32. Plaintiffs distort and mischaracterize two cases to charge CP with dereliction of common carrier duties. *See* Pls.' Br. at 13 (citing *Consolidated Rail Corp. v. I.C.C.*, 646 F.2d 642, 650 (D.C. Cir. 1981) (*Conrail*); *Akron*, 611 F.2d, at 1169). Plaintiffs would have the Court believe that *Conrail* and *Akron* prohibit any deviation from minimum regulatory standards. Pls.' Br. at 13 ("In fact, a railroad may not claim a commodity is too dangerous to transport if there are federal regulations governing such transport, and those regulations have been met.").

*Conrail* addressed the presumption that stricter safety measures were unnecessary *unless* the railroad shows that the current standards are insufficient or inadequate. *Conrail*, 646 F.2d at 650 (acknowledging rebuttable presumption against "expenditures for safety measures not specified" by regulation, but allowing reasonable standards above the minimum upon a showing of current standard insufficiency).

Similarly, plaintiffs fail to recognize that *Akron* envisioned the possibility that a railroad could deviate from the minimum regulatory requirements. *Akron*, 611 F.2d at 1169 ("A carrier thus cannot refuse to haul any materials which meet (DOT and NRC) standards, *but it may seek approval of a stricter practice which is shown to be just and reasonable*." (emphasis added)). Thus more demanding safety standards can be imposed when extant minimum safety regulations do not adequately ensure safety. *Id.*; *see also*

*Union Pac. R.R. Co. – Petition for Declaratory Order*, STB Finance Docket, No. 35219, 2009 WL 1630587, at *4 (June 11, 2009) ("*Union Pac. Dec. Order*"). The undisputed evidence about non-normalized steel's shoddy crash performance establishes the insufficiency of the current tank car regulations. Item 55 simply follows the *Akron* court's invitation for railroads to employ stricter practices that are "just and reasonable." *Akron*, 611 F.2d at 1169.[8]

The government statement establishing the Toxic by Inhalation Hazard Common Carrier Transportation Advisory Committee (TIHCCTAC) confirms that conclusion. The STB acknowledged railroad discretion to modify TIH-shipment standards as follows: "*an industry-derived solution* to the question of what constitutes a reasonable response to a shipper's request that a railroad transport TIH cargo might be a better and potentially more economically suitable solution than a Board-imposed solution[.]" *Establishment of the [TIHCCTAC]*, STB Docket No. EP 698, 2010 WL 3053101, at *3 (S.T.B. Aug. 5, 2010) (emphasis added). Because the industry-derived solution embodied in Tariff 8 meets government minimum standards and calls for a safer alternative at a nominal cost to the shippers, the STB would undoubtedly reject Item 55 attacks.

---

[8]     Notably, plaintiffs ignore the context in which *Conrail* and *Akron* arose. Both cases originated before the Commission (now the STB) and reached the courts as an appeal from the agency's final order. *See Conrail*, 646 F.2d at 646 ("following the ICC's May 2 order, petitioner railroads ask this court to set that order aside."); *Akron*, 611 F.2d at 1163 ("Petitioners are twenty-two eastern railroad companies ("the railroads") which seek relief from the Commission's order …"). *Conrail* and *Akron* demonstrate STB primary jurisdiction over this dispute. The controversy over Item 55 can only be judicially aired after the STB decides the issue.

Congress authorized the Secretary of Transportation to prescribe regulations and issue orders for every area of railroad safety.  49 U.S.C. § 20103(a).  Under delegation from the Secretary, the FRA enforces the federal regulations, which "prescribe[] minimum safety requirements."  *See, e.g.* 49 C.F.R. § 213.1.  The railroads are not restricted "from adopting and enforcing additional or more stringent requirements not inconsistent" with the federal regulations.  *See, e.g. id.*

Plaintiffs distort the common carrier obligation to require railroads to "'provide transportation or service on reasonable request,' 49 U.S.C. § 11101(a), and in tank cars that are designed under specifications set forth by the DOT." Pls.' Br. at 13. Conspicuously absent from that contention is a citation for the second half of the sentence, which purports to demand blind adherence to DOT minimum standards and no more.  A citation is lacking because the contention mischaracterizes the law.

*Delta Air Lines, Inc. v. C.A.B.* is instructive. *Delta* considered the Civil Aeronautics Board (CAB) rejection of an airline's refusal to transport Federal Aviation Administration designated "dangerous articles." 543. F.2d 247, 251 (D.C. Cir. 1976). The CAB purported to invalidate the tariffs as being more restrictive than DOT's standards. *Id.* at 261. The court disagreed and held that the more restrictive tariffs were "in conformity with" the regulations because minimum requirements had been satisfied. *Id.* at 261-62.

In other words, because the tariffs were "more stringent," "more restrictive," and "more narrow in scope," than the minimum government standards, the airline complied with the minimum regulations. *Id.* at 262. Like in *Delta*, CP may properly demand that

shippers meet standards that exceed minimum government regulations without violating common carrier obligations. Item 55 is an acceptable, reasonable term of service. All shippers need to do to ship TIH lading on CP is to load those commodities into normalized-steel tank cars.

        4.     *The request for CP to carry TIH lading in non-normalized steel tank cars is unreasonable*

The STB is not likely to reject CP's tariff in favor of plaintiffs' unreasonable request. What constitutes a "reasonable request for service" is not defined in statute, but depends on "all the relevant facts and circumstances." *Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 346 (D.C. Cir. 2013) (citation omitted).

Plaintiffs' request to ship TIH lading in non-normalized steel tank cars is unreasonable for various reasons, including: (1) plaintiffs and other shippers have been aware that stricter standards were under consideration since 2008 when PHMSA issued a notice of proposed rulemaking regarding TIH-lading tank car specifications; (2) a sufficient number of normalized steel tank cars are available; and (3) the spate of incidents involving the movement of hazardous lading necessitates shipper involvement in danger abatement, including voluntarily abiding by stricter TIH-lading tank car standards in order to protect those who live and work near railroad tracks. CP has easily demonstrated that the current safety standards are insufficient.

          (a)     TIH-commodity shippers have known about the need for increased tank car safety for at least six years

Plaintiffs and other shippers have been on notice that the use of normalized steel cars would be mandated at some point in the relatively near future. The PHMSA began the process for amending TIH-lading tank car requirements in 2008 and 2009. Instead of forcing shippers to abide by more rigorous safety standards, and in reliance on shipper commitments to phase out older, non-normalized-steel tank cars by January 2014, the PHMSA acknowledged that the "interim standards…are the first part of a longer-term strategy to enhance the safety of rail shipments of PIH materials." Hazardous Materials: Improving the Safety of Railroad Tank Car Transportation of Hazardous Materials, 74 Fed. Reg. 1,700, 1,772 (Jan. 13, 2009) ("Hazardous Materials II"). The PHMSA "continue[d] to believe that an accelerated phase out of [non-normalized steel] cars is justified." *Id.* at 1,777. And even though regulation banning substandard tank car was not ultimately promulgated, the PHMSA expected shippers to prioritize the retirement of pre-1989 non-normalized-steel tank cars. *Id.* Accordingly, plaintiffs and other shippers have known that more stringent safety standards were in the works and should have been prepared for the change.

While the PHMSA ultimately decided not to specify a phase-out deadline for non-normalized tank cars, the agency based that decision, in part, on TIH ladings shippers' representations that non-normalized-steel tank cars would be "completely removed" from TIH lading service earlier than the proposed five-year phase out – i.e., by the end of 2013. *E.g.*, Hazardous Materials II, 74 Fed. Reg. at 1,777 ("Specifically, [The Fertilizer

Institute] states that its members utilize approximately 4,600 tank cars to ship anhydrous ammonia and only about 340 of those care are pre-1989 non-normalized steel cars. Further, TIF notes that its members anticipate that these 340 non-normalized steel cars will be completely removed from their anhydrous ammonia fleets earlier than the five years proposed in the [notice of proposed rulemaking].";  "For example, one member, CF Industries, Inc., states that, beginning in 2005, it began to voluntarily modernize its fleet of anhydrous ammonia tank cars by phasing out 313 of its pre-1989 non-normalized steel cars. CF indicates that it plans to remove the remaining 24 non-normalized steel cars from its fleet of anhydrous ammonia cars by the end of 2008.").

Rather than meeting that self-imposed deadline, the shippers associated with plaintiffs continue to tender for shipment by TIH lading in non-normalized-steel cars, appear to have misrepresented intentions about eliminating outdated cars, and will fight any attempt to promote TIH lading safety. Accordingly, the Court should accord no significance to the PHMSA's failure to mandate an expedited schedule for the phase-out of non-normalized rail tank cars; the circumstances have changed in the intervening five years.

Shippers' representation about phasing out older tank cars warrants no credence. Years ago those same shippers promised that non-normalized cars would be phased out by the beginning of 2014. They lied to PHMSA about their phase out intentions then; there is no reason to believe they are not lying about non-normalized steel tank car intentions now. Neither CP nor the public should be forced to bear the risk of TIH lading being moved in non-normalized-steel tank cars for 15 more years, until 2039.

    (b) The public's interest in safe TIH lading transportation is important, and Item 55 furthers that interest

Finally, CP merely seeks to make TIH lading shipments safer for railroad employees and the public. CP and shippers both benefit when the number of TIH commodity disasters decrease and the public is protected. Logic compels this conclusion, and the *Conrail* court agreed: "Clearly a railroad company acts reasonably when it tries to promote the safety of its employees, passengers, and property." *Conrail*, 646 F.2d at 648 (citation and quotation omitted). The increased safety that the shipment of TIH lading in normalized steel tank car would promote justifies Item 55's requirements, especially when compared to the slight inconvenience that plaintiffs would experience by having to draw upon the readily available supply of normalized steel tank cars or other means to satisfy or avoid Item 55 standards.

Normalized steel tank cars are materially safer than those constructed out of non-normalized steel. CP operates exclusively in Canada and the northern United States. Non-normalized steel tank cars become more brittle at lower temperatures. Kozey Aff., ¶ 9. As tank cars become colder and more susceptible to failure, less energy causes ruptures. *Id.* CP, as a railroad that exclusively operates where temperatures tend to be colder, needs to ensure that TIH-lading moves in normalized-steel tank cars.

The NTSB has acknowledged that the current non-normalized-steel tank cars are not suitable for TIH-lading shipments and that inadequate design and materials create a greater risk of hazardous substance release. Sawers Aff., Ex. A (NTSB Safety Recommendation).

For these reasons, the STB would be unlikely to reject Item 55. Instead, because CP's tariff conforms with the rules regulating the carriage of TIH lading and because plaintiffs can readily comply with Item 55, the STB would not likely compel CP to carry TIH lading in non-normalize- steel tank cars.

And without regard to the merits of the attack on Item 55, plaintiffs have not complied with *Kessler* and similar cases, requiring exhaustion of administrative remedies. *See supra*, I.B. Plaintiffs could never, in the first instance, succeed on the merits in this Court because the ICCTA requires exhaustion of STB remedies. Judicial review became available only after administrative remedies have been exhausted.

Plaintiffs' likelihood of success on the merits before this Court is nil. Furthermore, their likelihood of success at the STB is speculative at best. The minimally-stricter standards imposed by Item 55, the availability of tank cars that meet Item 55 standards, and the reasonableness of Item 55 terms of service mean that the STB would undoubtedly allow CP's tariff stand.

## C.   The balance of harms requires motion denial

The balance of harms weighs heavily against prohibiting CP from subjecting TIH-lading shippers to stricter, potentially life-saving safety standards. By granting plaintiffs motion, the Court would enable plaintiffs to maintain their profits from the sale and delivery of TIH commodities. But if the Court allows Item 55 to stay in effect, the worse that could happen would be plaintiffs incurrence of increased operating costs or decreased profits. At the same time the potential for serious TIH lading accidents would be reduced.

And if the STB were to agree that Item 55 is unreasonable all losses sustained by plaintiffs could be recovered. In contrast, a TIH lading incident in a heavily-populated area could wipe CP out and injure and kill a countless number people. By reducing that risk, Item 55 benefits CP as well as the public. And a dollar value cannot be placed on the deaths and physical injuries that could be sustained by the involvement of uncrashworthy tank cars in a TIH lading accident. No amount of money could bring a TIH-lading victim back to life.

Under the current liability framework, the shippers are in a race to the bottom: they have no incentive to do anything but the bare minimum with regard to tank-car safety. Wilson Aff. ¶¶ 3, 15. Because the liability for rail accidents often falls exclusively on railroads, shippers have no economic motivation to ship in containers that exceed minimum DOT requirements. Allowing shippers to continue this cavalier approach in the face of CP's attempt to enhance TIH-lading transportation safety tips the balance of harm precipitously in favor of denying plaintiffs' motion.

Plaintiffs also ask the Court to conclude that the PHMSA's five –year-old decision not to require normalized steel establishes that non-normalize steel tank cars are still just fine. Pls.' Br. at 14. But the PHMSA declined to mandate an accelerated phase-out because shippers promised to get rid of the less safe tank cars sooner than PHMSA would have required. That process was supposed to be completed by the end of 2013. While the shippers failed to fulfill their promises, rail traffic has surged in the last five years.  With more trains on the rails, chances of a TIH-lading catastrophe have increased. Given that elevated risk, the PHMSA's five-year-old decision cannot be regarded as dispositive.

The harm CP would sustain in the event of TIH-laden tank car's brittle failure dwarfs the potential for plaintiffs to incur increased costs. A TIH-lading incident could put billions of dollars and corporate survival at risk. Besides that, as demonstrated below, third parties would suffer extreme harm.

**D.     The public interest weighs heavily in favor of denying plaintiffs' request to force less safe tank cars onto CP's railroad**

The public interest factor requires denial of plaintiffs' motion. Plaintiffs are concerned about their bottom lines. CP is attempting to proactively minimize the likelihood of catastrophic injuries to innocent people and property. Wilson Aff. ¶ 5, 12. A TIH lading release is not acceptable to CP. If allowed, CP would refuse to carry TIH lading and forego any revenues associated with such service so as to avoid facing the consequences of a TIH-lading disaster. Wilson Aff., ¶ 18. Notably, if plaintiffs are right about Item 55 safety standards preventing them from shipping all of the chlorine that they can sell, CP would also lose the revenue generated by those shipments. The losses associated with foregone sales and shipment are monumentally less significant than the potentially staggering damages that the public could sustain in the event of a major TIH-lading accident caused or contributed to by tank cars not constructed of readily available materials that minimize the risk of brittle failures.

The use of normalized steel tank cars would enhance TIH-lading carriage safety. Wilson Aff. ¶ 13; Kozey Aff. ¶ 9-10. Importantly, plaintiffs acknowledge that normalization is "desirable." Reiner Aff. at 7. Because safety measures that lessen the likelihood of a catastrophic TIH product release can be readily employed, the public

interest demands that shippers and railroads alike adopt those measures. The protection of human health and the environment supports the denial of plaintiffs' motion.

**CONCLUSION**

The Court should let the STB decide issues, like this tariff dispute, that fall within the agency prerogative and expertise. Even if STB primary jurisdiction deferral were not compelled, the Court should not grant the extraordinary relief that plaintiffs seek. Any harm that could be suffered would be curable by a money judgment. If that were not enough, plaintiffs stand virtually no chance of success before the STB; the balance of harms obligates the Court to put CP's survival and public safety ahead of plaintiffs' bottom lines; and the public interest encourages railroads to conduct as safe as possible operations. For these simple but overwhelming reasons, plaintiffs' motion should be denied.

Dated:  April 22, 2014                     **BRIGGS AND MORGAN, P.A.**


By: *s/ Timothy R. Thornton*
    Timothy R. Thornton (#109630)
    Kevin M. Decker (#0314341)
    Jonathan P. Schmidt (#0329022)
2200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402-2157
(612) 977-8400

**ATTORNEYS FOR DEFENDANT SOO LINE  RAILROAD,  d/b/a  CANADIAN PACIFIC**