UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THE CHLORINE INSTITUTE, INC.; THE AMERICAN CHEMISTRY COUNCIL; THE FERTILIZER INSTITUTE; ERCO WORLDWIDE; and PVS CHEMICALS, | Case No. 14-CV-1029 (PJS/SER) |
| Plaintiffs, | |
| v. | ORDER |
| SOO LINE RAILROAD, d/b/a Canadian Pacific Railway Company, | |
| Defendant. | |

Paul M. Donovan, LAROE, WINN, MOERMAN & DONOVAN; Stephen P. Laitinen and Jennifer L. Young, LARSON KING, LLP, for plaintiffs.

Timothy R. Thornton, Kevin M. Decker, and Jonathan P. Schmidt, BRIGGS AND MORGAN, P.A., for defendant.

Defendant Canadian Pacific Railway Company ("CP") recently amended its Tariff No. 8. Pursuant to that amendment, CP now requires that any tank car that contains "toxic inhalation hazard" ("TIH") commodities and that is tendered to CP for transport must meet certain manufacturing standards.  In particular, CP now requires such tank cars to be constructed of normalized steel, which is steel that has been heat treated to better resist fracturing in the event of a crash or derailment.  The amendment to Tariff No. 8 took effect on April 14, 2014.

Plaintiffs ERCO Worldwide and PVS Chemicals are businesses that manufacture and distribute TIH commodities, and plaintiffs the Chlorine Institute, Inc., the American Chemistry Council, and the Fertilizer Institute are trade associations that represent such businesses.

Plaintiffs filed this action on April 10, 2014, challenging CP's requirement that any tank car containing TIH commodities be constructed of normalized steel.

This matter is before the Court on plaintiffs' motion for a temporary restraining order and preliminary injunction. For the reasons stated below, the Court denies plaintiffs' motion and dismisses this action without prejudice under the doctrine of primary jurisdiction.[1]

## I. BACKGROUND

### A. The HMTA and Common-Carrier Obligations

Plaintiffs bring two substantive claims: a claim under the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. §§ 5101 et seq., and a claim under 49 U.S.C. § 11101, which codifies the common-carrier obligations of rail carriers.[2]

Under the HMTA, the United States Department of Transportation ("DOT") has the authority to designate materials as hazardous and regulate the shipment of such materials in intrastate, interstate, and foreign commerce. 49 U.S.C. § 5103(a), (b)(1); 49 U.S.C. § 5102(11).

---

[1] CP did not formally move to dismiss the complaint, but, in opposing plaintiffs' motion, CP argued (among other things) that the motion should be denied because this case should be dismissed under the doctrine of primary jurisdiction. The parties thoroughly briefed the issue of primary jurisdiction, and the issue was a focus of oral argument. Nothing would be gained by requiring further briefing and argument regarding the doctrine of primary jurisdiction.

[2] The parties dispute whether there is a private right of action under the HMTA. Plaintiffs concede that they have no right to seek *injunctive* relief under the HMTA, but contend that they nevertheless have a right to seek *declaratory* relief under that statute. ECF No. 23 at 9-10. The Court is skeptical about plaintiffs' argument, but the Court need not resolve it, because there is no dispute that the Court has jurisdiction over plaintiffs' § 11101 claim. *Pejepscot Indus. Park, Inc. v. Me. Cent. R.R.*, 215 F.3d 195, 197 (1st Cir. 2000). Plaintiffs' § 11101 claim is, in essence, that because CP's amended tariff violates the HMTA, CP has unreasonably refused to provide service in violation of its common-carrier obligations. Thus, even if plaintiffs cannot bring a claim directly under the HMTA, they can bring what is in substance an HMTA claim under § 11101.

The DOT has delegated this authority to the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), which is part of the DOT.  *See* 49 U.S.C. § 108(a).  The PHMSA has promulgated regulations requiring that tank cars used to ship hazardous materials meet certain manufacturing and other specifications.  49 C.F.R. § 173.31(a)(1).

Under the common-carrier obligation codified in 49 U.S.C. § 11101, a "rail carrier providing transportation or service subject to the jurisdiction of the [Surface Transportation] Board under this part shall provide the transportation or service on reasonable request."  *Id.* § 11101(a); 49 U.S.C. § 10102(1) ("Board" means the Surface Transportation Board).  Rail carriers are also required to "furnish safe and adequate car service and establish, observe, and enforce reasonable rules and practices on car service."  49 U.S.C. § 11121(a)(1).  In addition, rail carriers must establish reasonable rates, rules, and practices relating to their transportation services.  49 U.S.C. § 10702.

### B.  The DOT's Consideration of Normalized Steel Cars

In April 2008, the DOT issued a Notice of Proposed Rulemaking "to improve the crashworthiness protection of railroad tank cars designed to transport poison inhalation hazard materials."  *Hazardous Materials: Improving the Safety of Railroad Tank Car Transportation of Hazardous Materials*, 73 Fed. Reg. 17818, 17818 (proposed Apr. 1, 2008).  ("Poison inhalation hazard materials" is another name for TIH materials.)  The DOT proposed stricter performance specifications for new tank cars.  *Id.*  In the meantime, the DOT also proposed an accelerated phase-out of non-normalized-steel cars, all of which were manufactured before 1989.  *Id.* at 17822; *see* Reiner Aff. at 6-7 (noting that, since 1989, industry standards have required that tank cars used to transport TIH products be constructed of normalized steel).  As the DOT

observed, these pre-1989 cars "are reaching the upper limits of their useful life." 73 Fed. Reg. at

17822.

The DOT proposed to prohibit the use of non-normalized-steel cars beginning five years

after the effective date of the final rule. *Id.* After receiving public comments, however, the DOT

declined to adopt a mandatory phase-out of non-normalized-steel cars. *Hazardous Materials:*

*Improving the Safety of Railroad Tank Car Transportation of Hazardous Materials*, 74 Fed. Reg.

1770, 1777-78 (Jan. 13, 2009). Instead, the DOT required that tank-car owners prioritize the

removal of non-normalized-steel cars when removing cars from TIH-materials service. *Id.* That

requirement (along with the rest of the new rules) became effective on March 16, 2009. *Id.*

at 1770.

CP's amendment to Tariff No. 8 — the amendment that altogether prohibits the use of

non-normalized-steel cars for transporting TIH materials — took effect on April 14, 2014, which

is just over five years after the effective date of the DOT's new rules. As plaintiffs would have

it, then, CP is trying to impose the very restriction that the DOT specifically declined to adopt

back in 2009. Plaintiffs argue that, because the DOT already considered and rejected a

prohibition on the use of non-normalized-steel cars, CP's attempt to unilaterally impose such a

prohibition violates both the HMTA and CP's common-carrier obligations under § 11101.

II.  ANALYSIS

*A.  Primary Jurisdiction*

Both federal courts and the Surface Transportation Board ("STB") have jurisdiction to

determine whether a carrier's practices violate § 11101. *Pejepscot Indus. Park, Inc. v. Me. Cent.*

*R.R.*, 215 F.3d 195, 197 (1st Cir. 2000).[3]  Under the doctrine of primary jurisdiction, however, courts almost invariably defer to the STB's expertise regarding such disputes.  *See Elam v. Kan. City S. Ry.*, 635 F.3d 796, 810 (5th Cir. 2011) (actions under the Interstate Commerce Commission Termination Act, which includes § 11101, "ordinarily should be stayed and the relevant claims referred to the STB"); *DeBruce Grain, Inc. v. Union Pac. R.R.*, 149 F.3d 787, 789-90 (8th Cir. 1998) (affirming dismissal of §§ 11101 and 11121 claims under primary jurisdiction); *Pejepscot*, 215 F.3d at 205-06 (concluding that district court should refer § 11101 claim to the STB); *Overbrook Farmers Union Coop. Ass'n v. Mo. Pac. R.R.*, 21 F.3d 360, 362 (10th Cir. 1994) (noting that district court had referred § 11101 claim to the ICC).  Indeed, plaintiffs candidly admitted at oral argument that they are not aware of a single case in which a federal district court faced with a similar challenge to a rail carrier's practices declined to abstain in favor of the STB.

It is not surprising that courts have deferred to the STB regarding common-carrier claims. Determining what constitutes a "reasonable request" under § 11101(a) — and determining whether a carrier's practices are "reasonable" under §§ 11121 and 10702 — are extremely complicated, fact-intensive inquiries that require both extensive practical knowledge of the nation's rail system and a careful weighing of a broad array of costs and benefits.  *Cf. DeBruce Grain*, 149 F.3d at 789 (§ 11101 claims require knowledge about the economics and technology of the regulated industry); *Akron, Canton & Youngstown R.R. v. I.C.C.*, 611 F.2d 1162, 1169-70 (6th Cir. 1979) (noting factors that the ICC could consider in deciding whether carrier could

---

[3]The STB is the successor to the Interstate Commerce Commission, which it replaced as of January 1, 1996.  49 U.S.C. §§ 701-02.  In this opinion, the Court's references to the STB are intended to include its predecessor.

reasonably charge higher rates for additional safety measures).  Courts recognize that the STB

has substantial expertise in determining what constitutes an unlawful refusal to provide service

under § 11101.  *Pejepscot*, 215 F.3d at 205-06.  In addition, the STB's ability to solicit comments

from all interested parties — including, most importantly, the DOT and other federal agencies —

is a considerable institutional advantage.  *See Union Pac. R.R. — Petition for Declaratory Order*,

STB Fin. Docket No. 35219, 2009 WL 1630587, at *3 (S.T.B. June 11, 2009) (noting that the

STB received comments from the DOT and the Transportation Security Administration).  And

finally, abstaining in favor of the STB promotes national uniformity in rail-service standards.

*Pejepscot*, 215 F.3d at 206; *DeBruce Grain*, 149 F.3d at 789-90.

  A recent decision of the STB illustrates why the STB is far better suited than this Court to

address plaintiffs' challenge to the amendment to Tariff No. 8.  In *Union Pacific Railroad*

*Company — Petition for Declaratory Order*, the STB had to decide whether the carrier violated

its common-carrier obligation by refusing to quote rates for the transportation of chlorine to

certain cities.  2009 WL 1630587, at *1.  The carrier contended that it should not be required to

deliver chlorine to the cities because doing so would require it to carry chlorine over 1,000 miles

through multiple "High Threat Urban Areas" and because each of the cities had ample nearby

supplies of chlorine.  *Id.*  In considering whether the carrier's refusal was justified, the STB had

the benefit of commentary from the DOT, the Transportation Security Administration, and

numerous shippers, receivers, other carriers, and trade associations.  *Id.* at *1, *3.  In many

respects, the proceeding resembled agency rulemaking, with input from numerous interested

parties and a careful balancing of various policy considerations.

In this case, as in *Union Pacific*, the STB's flexible procedures would be of great benefit. This Court can consider only the arguments and evidence presented by the parties before it. But the economic, safety, and logistical issues implicated by the shipment of TIH materials affect numerous other parties and the public at large. Unlike this Court, the STB has the institutional tools and expertise to consider the problem from a national perspective. In addition, the STB can obtain the input of the DOT, which is essential given that the DOT has already studied the question of whether and how non-normalized-steel cars should be phased out of use.

Plaintiffs nevertheless contend that there is no need for the STB to get involved because this case involves a straightforward legal issue. According to plaintiffs, the DOT has the sole authority to regulate the shipment of hazardous materials under the HMTA, and thus CP is not allowed to impose safety requirements that are stricter than those imposed by the DOT. For that reason, plaintiffs say, CP's amendment to its tariff is illegal on its face, and there is no need to analyze whether it is reasonable.

But plaintiffs cite no authority for the proposition that rail carriers cannot impose additional safety requirements, and the case law is to the contrary. *See Consol. Rail Corp. v. I.C.C.*, 646 F.2d 642, 650 (D.C. Cir. 1981) (recognizing that railroads may seek to prove the reasonableness of safety measures in addition to those imposed by the DOT for the shipment of radioactive materials); *Akron, Canton & Youngstown R.R. v. I.C.C.*, 611 F.2d 1162, 1170 (6th Cir. 1979) ("while DOT and [the Nuclear Regulatory Commission] have exclusive authority to promulgate Industry-wide standards for the carriage of radioactive materials, the ICC may allow Individual carriers to make more (but not less) stringent rules for their own carriage of hazardous

materials"); *see also Union Pac. R.R.*, 2009 WL 1630587, at *2 ("carriers are not precluded from seeking imposition of stricter safety standards").

Plaintiffs distinguish these cases on the ground that they do not involve the HMTA, which (among other things) specifically regulates rail-car construction. Again, however, plaintiffs point to nothing in the HMTA or any other statute or regulation that prohibits rail carriers from imposing safety requirements in addition to those in the HMTA.[4]

Plaintiffs also argue that deference to the STB is not warranted in this case because the STB does not regulate safety; that is the DOT's job. But as the *Union Pacific* case described above illustrates, the STB routinely considers issues of safety and, where appropriate, defers to or seeks the input of the DOT and other federal agencies. *See also Granite State Concrete Co. v. S.T.B.*, 417 F.3d 85, 95 (1st Cir. 2005) (the STB could decide whether a carrier had good reason to be concerned about safety and whether its response to those concerns was reasonable); *Consol. Rail Corp.*, 646 F.2d at 651 (articulating factors that the ICC could consider in deciding whether safety measures in addition to those imposed by the DOT and Nuclear Regulatory Commission were reasonable); *Akron, Canton & Youngstown R.R.*, 611 F.2d at 1168-70 (the STB could

_____

[4]The Court notes that the DOT's hazardous-material regulations state that "[t]ank cars and appurtenances may be used for the transportation of any commodity for which they are authorized in this part and specified on the certificate of construction . . . ." 49 C.F.R. § 173.31(a)(2). This language could be read to imply that carriers must accept hazardous materials contained in tank cars authorized to transport such materials. Plaintiffs do not rely on or even cite this language in their briefs, however. Without the benefit of briefing, the Court can only observe that this language appears merely descriptive; in other words, it describes how tank cars may be used, but does not prohibit carriers from imposing additional requirements on those cars. The Court assumes that if the DOT intended to prohibit carriers from imposing additional requirements — a prohibition that would displace federal case law recognizing that carriers have such a right — the DOT would have been much clearer. In any event, given that plaintiffs did not rely on this language, the Court need not consider it further.

consider safety issues in determining whether carriers could impose additional restrictions on the transport of nuclear materials).

Moreover, the safety issue in this case — whether non-normalized-steel cars are sufficiently safe for the transport of TIH materials — appears to be more of a policy issue than a technical one. The DOT appears to believe that, all things being equal, the use of normalized-steel cars is preferable. 74 Fed. Reg. at 1777-78 (noting that the DOT believes that an accelerated phase-out of non-normalized cars is "justified"). The real question appears to be whether the potential safety benefits of using normalized-steel cars outweigh the costs and the potentially negative impact of CP's amended tariff on the nation's supply of TIH materials. The STB is far better situated than this Court to address this question.

Because the Court concludes that it would be better for all concerned if the parties' dispute were to be addressed by the STB, the Court will dismiss this action without prejudice under the doctrine of primary jurisdiction. *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993) (after referring a dispute to an agency with primary jurisdiction, a district court may dismiss without prejudice if the parties would not be unfairly disadvantaged); *DeBruce Grain*, 149 F.3d at 789-90 (affirming dismissal without prejudice under the doctrine of primary jurisdiction). Before dismissing the case, however, the Court addresses whether it should issue a preliminary injunction pending the STB's determination.

### B.  Preliminary Injunction

A court must consider four factors in deciding whether to grant a preliminary injunction or a temporary restraining order:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between

this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Preliminary injunctions are extraordinary remedies, and the party seeking such relief bears the burden of establishing its entitlement to an injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### 1.  Likelihood of Success

Because the Court is deferring to the STB, the question is whether plaintiffs are likely to succeed before the agency.  Plaintiffs' primary argument on the merits is that CP is prohibited from adopting any safety standard for rail cars that is stricter than the standards imposed by the DOT.  As discussed above, however, plaintiffs have not identified any provision of any statute or regulation that imposes such a prohibition, nor have they cited any other authority that supports their argument.  In the absence of such a prohibition, plaintiffs are left to argue that CP's amended tariff is unreasonable.  *DeBruce Grain*, 149 F.3d at 789 ("The basic question presented by the complaint in this case was whether UPR's response to DeBruce's request for cars was reasonable.").

In plaintiffs' favor, they can invoke the presumption that the DOT's hazardous-material regulations — regulations that do not prohibit the use of non-normalized-steel cars — are sufficient to assure the safe transportation of TIH materials.  *See Consol. Rail Corp.*, 646 F.2d at 652 ("the safety regulations promulgated by DOT and [the Nuclear Regulatory Commission] are entitled to be considered by the ICC as embodying prima facie the appropriate balance between safety and nuclear development").  The burden is on CP to rebut this presumption.  *Id.*

at 650-51.  The District of Columbia Circuit has provided some examples of how the

presumption may be rebutted:

> For example, it might be shown that DOT and NRC did not intend
> to establish comprehensive regulations to assure safe transportation
> of radioactive materials, but rather hoped that other agencies or
> private industry would substantially supplement their regulations;
> or else it might be shown that the regulations were drafted without
> any knowledge of the STS option; or that the railroads lacked any
> meaningful opportunity to present the STS option to DOT or NRC;
> or that some unusual or special conditions related to petitioners'
> particular eastern railroad routes made imposition of STS
> reasonable in their case.

*Id.* at 651.

Plaintiffs argue that CP's amended tariff is unreasonable because the DOT has already

considered and rejected a proposal to phase out non-normalized-steel cars.  CP argues, however,

that the DOT never found that non-normalized-steel cars were as safe as normalized-steel cars.

Instead, according to CP, the DOT declined to require that non-normalized-steel cars be phased

out because the DOT believed that the issue would soon become moot.  During the rulemaking

process, the DOT was told that the TIH-shipping industry was already making voluntary efforts

to phase out non-normalized-steel cars.  74 Fed. Reg. at 1777.  In deciding not to impose a

mandatory phase out, the DOT commented that "we continue to believe that an accelerated phase

out of these cars is justified" but that "we recognize the voluntary efforts already underway by

many fleet owners to phase out these cars, in many cases on schedules more aggressive than the

five-year deadline proposed in the [notice of proposed rulemaking]."  *Id.* at 1777-78.  Moreover,

although the DOT did not impose a deadline, it did not leave the use of non-normalized-steel cars

completely up to shippers' discretion.  The DOT required shippers to prioritize the removal of

non-normalized-steel cars whenever they remove cars from TIH service.  *Id.* at 1778.  In CP's

view, then, CP is justified in imposing the amended tariff — not just because the DOT

recognized that normalized-steel cars are safer, but because the DOT expected that shippers

would have removed all non-normalized-steel cars from TIH service by now.

Plaintiffs and CP both make good arguments.  As discussed above, however, determining

whether CP's amended tariff is reasonable is a fact-intensive undertaking that will require input

from many sources.  Even if the Court had the expertise and resources of the STB (which it does

not), the Court has only a scanty record at this point and cannot confidently predict a win for

either side.  At best, then, the Court can say only that plaintiffs have a possibility of success on

the merits.  In the Court's view, however, this possibility is not so substantial as to justify the

extraordinary relief of a preliminary injunction without a strong showing on the other *Dataphase*

factors.

## 2.  Irreparable Harm

Harm that is compensable with money damages is not irreparable.  *DISH Network Serv.*

*L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013) ("Economic loss, on its own, is not an

irreparable injury so long as the losses can be recovered.").  Thus, the fact that plaintiffs may

incur increased costs as a result of CP's amended tariff does not justify a preliminary injunction.

Plaintiffs contend that they will not merely suffer increased costs, however.  They argue

that they will actually be unable to ship their products because they will not be able to obtain a

sufficient number of normalized-steel cars to comply with CP's amended tariff.  As a result,

plaintiffs contend, they will suffer irreparable harm in the form of damage to their reputations

and goodwill.  Plaintiffs also raise the specter of a public-health crisis, contending (among other

things) that CP's amended tariff places the nation's water supply at risk from untreated

wastewater and will deprive the nation's farmers of fertilizer for their crops.

But plaintiffs offer remarkably little evidence in support of their contentions.  Only one

shipper, PVS Chemical Solutions, Inc. ("PVS"), has submitted an affidavit concerning the impact

of CP's amended tariff on its business.  Of PVS's 100 cars, 31 are constructed of non-normalized

steel.  Larson Aff. at 2.  The only evidence that PVS offers to show that CP's amended tariff will

limit its ability to ship TIH products is the following statement:  "[G]iven the current tank car

construction situation following the well-publicized derailment of crude oil tank cars in Quebec,

PVS would very likely be unable to replace the cars that CP proposes to embargo."  Larson Aff.

at 2.  The only other evidence in the record regarding the impact of CP's amended tariff is the

assertion of the president of the Chlorine Institute that the "inability to utilize [non-normalized-

steel] cars would create an immediate shortage of railcars that are used to transport chemicals

critical to health and safety . . . ."  Reiner Aff. at 8.

Neither PVS nor the members of the Chlorine Institute explain why they cannot lease or

otherwise obtain a sufficient supply of normalized-steel cars (which have been industry standard

since 1989) to replace their non-normalized-steel cars (which, according to what the industry told

the DOT in 2009, should no longer be in use).  Nor do they give any indication that they have

even *attempted* to find alternative ways to meet their needs for normalized-steel cars, much less

explained their efforts and their success or lack of success.  In the absence of such details, the

Court gives little weight to plaintiffs' gloomy predictions.  *Cf. Novus Franchising, Inc. v.

Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) ("In order to demonstrate irreparable harm, a party

must show that the harm is certain and great and of such imminence that there is a clear and

present need for equitable relief." (citation and quotations omitted)); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction.")  After all, plaintiffs can continue using their non-normalized-steel cars on other railroads, and CP offers evidence that, even before its amended tariff took effect, 95 percent of the TIH-lading cars in use on its tracks were constructed after 1989 (and were thus constructed of normalized steel).  Wilson Aff. ¶ 16.  Given these facts, plaintiffs' conclusory assertions that they are unlikely to be able to obtain a sufficient number of normalized-steel cars does not establish a threat of irreparable harm.

### 3.   Balance of Harms and the Public Interest

Both the public and CP have an interest in ensuring that TIH products are transported without posing unnecessary risks (to the public) and threatening crippling liability (to CP).  As plaintiffs argue, however, the public also has an interest in ensuring an adequate supply of TIH products, many of which serve essential public functions.  Moreover, plaintiffs contend, there is no evidence that normalized-steel cars actually provide any safety benefits.

The Court is in no position to make even a preliminary finding about whether and to what extent normalized-steel cars are safer than non-normalized-steel cars — although, as noted above, the DOT has expressed a preference for normalized-steel cars.  No one seems to assert, however, that normalized-steel cars are *less* safe than non-normalized-steel cars.  If normalized-steel cars are even slightly safer than non-normalized-steel cars, that benefit to the public would outweigh the (nonexistent) threat of irreparable harm to plaintiffs.

In sum, having considered all of the *Dataphase* factors, the Court concludes that a preliminary injunction is not warranted.  Plaintiffs' possibility of success is not substantial

enough to justify a preliminary injunction, and none of the other *Dataphase* factors weighs in favor of such extraordinary relief.  Plaintiffs' motion is therefore denied, and this case is dismissed without prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Plaintiffs' motion for a temporary restraining order and preliminary injunction [ECF No. 7] is DENIED.

2.      This action is DISMISSED WITHOUT PREJUDICE under the doctrine of primary jurisdiction.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May  27 , 2014                      s/Patrick J. Schiltz_____
                                            Patrick J. Schiltz
                                            United States District Judge