# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2346
_____

The Chlorine Institute, Inc.; The American Chemistry Council; The Fertilizer Institute; Erco Worldwide; PVS Chemicals

*Plaintiffs - Appellants*

v.

Soo Line Railroad, doing business as Canadian Pacific Railway Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 12, 2015
Filed: July 2, 2015

_____

Before BYE, BEAM, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

     The Chlorine Institute, Inc., the American Chemistry Council, the Fertilizer Institute, Erco Worldwide, and PVS Chemicals (collectively "Appellants") filed this suit seeking to enjoin Soo Line Railroad, d/b/a Canadian Pacific Railway Company

("CP") from imposing a requirement that any toxic inhalation hazard ("TIH")[1] materials transported on CP's railways be transported in normalized steel rail cars.[2] Under the doctrine of primary jurisdiction, the district court[3] held the Surface Transportation Board ("STB") should address whether CP's requirement is reasonable in the first instance, denied the request for injunctive relief, and dismissed the suit without prejudice.  We affirm.

I

In 2009, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") of the Department of Transportation ("DOT")—the agency tasked with regulating the transportation of hazardous materials—finalized extensive amendments to the regulations for the transportation of TIH materials.  See Hazardous Materials: Improving the Safety of Railroad Tank Car Transportation of Hazardous Materials, 74 Fed. Reg. 1770 (Jan. 13, 2009) (codified in 49 C.F.R. pts. 171-174 & 179).  The regulations included substantial background information regarding the safety issues concerning the transportation of hazardous materials and prior train derailments leading to tragic harms.

The amendments explained there was a "need to enhance the crashworthiness protection of railroad tank cars" because "although rail transportation of hazardous materials is a safe method for moving large quantities of hazardous materials over

---

[1]In the industry, "poison inhalation hazard" and "toxic inhalation hazard" are interchangeable terms.

[2]Normalization produces steel with more ductile properties at lower temperatures.  As such, non-normalized steel train cars are more prone to brittle fractures than normalized steel cars at the same temperature.

[3]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

long distances, rail tank cars used to contain these materials have not been designed to withstand the force of high-speed derailments and collisions."  Id.  The amendments specifically noted several high-profile train derailments involving TIH materials, including the CP derailment in Minot, North Dakota, in 2002,[4] and explained that the failure of the tank cars in a derailment often leads "to fatalities, injuries, evacuations, and property and environmental damage."  Id. at 1771.  As a result of these incidents and concerns, the PHMSA initiated a strategy to improve the safety of transporting hazardous materials via rail tank cars by addressing "(1) [t]ank car design and manufacturing; (2) railroad operational issues such as human factors, track conditions and maintenance, wayside hazardous detectors, signals and train control systems; and (3) improved planning and training for emergency response."  Id.  In the proposed regulations, the agency proposed improving "tank-head and shell puncture-resistance standards" in the following way:

> The enhanced standards proposed to require tank cars that transport PIH materials in the United States to be designed and manufactured with a shell puncture-resistance system capable of withstanding impact at 25 mph and with a tank-head puncture resistance system capable of withstanding impact at 30 mph.  To ensure timely replacement of the PIH tank car fleet, we proposed an eight-year implementation schedule, contemplating design, development, and manufacturing ramp-up in the first two years, replacement of 50% of the fleet within the next three years, and replacement of the remaining 50% of the fleet in the following three years.  As part of this implementation plan, we proposed the expedited replacement of tank cars used for the transportation of PIH materials manufactured before 1989 with non-normalized steel head or shell construction.

Id. at 1772-73.

---

[4] As explained in the amendments, the 2002 derailment in Minot, North Dakota, involved a CP train and resulted "in the catastrophic release of anhydrous ammonia, leading to one death and 11 serious injuries."  74 Fed. Reg. at 1772.

Commentators to the proposed regulations, however, expressed numerous concerns including the feasibility of the existing technology to accomplish the resistance goals and the proposed eight-year implementation period as "overly-aggressive and not realistic." <u>Id.</u> at 1773-76. Furthermore, as particularly relevant to this case, "[w]ith regard to the proposed rule's requirement that all PIH tank cars constructed of non-normalized steel in the head or shell be replaced within five years . . . , several commentators note[d] the PIH shipping industry's voluntary efforts already underway to phase out these tank cars." <u>Id.</u> at 1777. Based on these concerns, the agency explained it was not going to force the retirement of such cars:

> We also are modifying our proposal for phasing out cars constructed prior to 1989 with non-normalized steel in the head or shell. Although we continue to believe that an accelerated phase out of these cars is justified, we recognize the voluntary efforts already underway by many fleet owners to phase out these cars, in many cases on schedules more aggressive than the five-year deadline proposed in the NPRM. Rather than imposing a fixed deadline, this rule requires rail car owners that elect to retire or remove rail tank cars from PIH service, other than because of damage to the cars, to prioritize the retirement or removal of pre-1989 non-normalized steel cars.

<u>Id.</u> at 1777-78. In other words, the rule "does not implement the proposed expedited replacement *requirement* for PIH tank cars" but instead "requires that tank car owners prioritize retirement or replacement of pre-1989 non-normalized steel cars when retiring or removing cars from PIH materials service." <u>Id.</u> at 1785 (emphasis added). However, the PHMSA recognized, in passing the regulations, that "the standards set forth . . . shall apply . . . *pending the development and commercialization of more stringent performance standards*." <u>Id.</u> at 1771 (emphasis added).

On April 14, 2014, CP put into effect its Item 55 of Tariff 8 which requires TIH materials transported on CP's railways to be shipped in normalized steel tank cars. The change was intended to increase safety and reduce the likelihood of a TIH

materials spill in the event of a derailment.  An executive from CP provided an affidavit explaining the potential drastic consequences of a TIH spill and CP's business reasons for pursuing a safer method of transport.  The affidavit cites the derailment in Minot and explains that it was one of the driving forces behind the change.

After receiving notice about CP's intended requirement, Appellants filed this suit and brought claims against CP under the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. §§ 5101-5128, and under 49 U.S.C. § 11101, which codifies the common-carrier obligations for rail carriers.  The next day, Appellants filed a motion for declaratory and injunctive relief.  On May 27, 2014, after a hearing on the merits of the motion, the district court issued its order holding, under the doctrine of primary jurisdiction, the STB should address the raised issue in the first instance, dismissing the suit without prejudice, and denying the request for injunctive relief after balancing the relevant factors.

II

On appeal, Appellants argue (1) there was no reason to defer to the expertise of the STB under the doctrine of primary jurisdiction because the question of whether CP has impermissibly expanded on the regulations promulgated by the DOT is a legal question; (2) even if the district court properly applied the doctrine of primary jurisdiction, it should have stayed the action rather than dismiss it; and (3) the district court erred in denying the preliminary injunction, even if the matter is referred to the STB.  We address each issue in turn.

A

Before addressing the application of the doctrine of primary jurisdiction, we must first consider our standard for reviewing a district court order applying the

-5-

doctrine.  There appears to be disagreement between our sister courts on whether such review is *de novo* or for an abuse of discretion, with the majority applying a deferential standard.  Compare Endo Pharm. Inc. v. Actavis Inc., 592 F. App'x 131, 133 (3d Cir. 2014); Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir. 1996); Wagner & Brown v. ANR Pipeline Co., 837 F.2d 199, 201 (5th Cir. 1988); Reid v. Johnson & Johnson, 780 F.3d 952, 958 (9th Cir. 2015); S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 750 (10th Cir. 2005); Boyes v. Shell Oil Prods. Co., 199 F.3d 1260, 1266 n.13 (11th Cir. 2000); Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp., 244 F.3d 153, 156 (D.C. Cir. 2001), with Ellis v. Tribune Television Co., 443 F.3d 71, 83 n.14 (2d Cir. 2006); see also Consol. Rail Corp. v. Grand Trunk W. R.R Co., No. 13-2269, 2015 WL 1727306, at *5 (6th Cir. Apr. 15, 2015).

On two prior occasions we avoided deciding the issue.  See Access Telecomms. v. S.W. Bell Tel. Co., 137 F.3d 605, 608 (8th Cir. 1998) ("Without deciding the standard-of-review question, . . . we accept the parties' invitation to review the primary jurisdiction issue de novo."); DeBruce Grain, Inc. v. Union Pac. R.R. Co., 149 F.3d 787, 790 n.4 (8th Cir. 1998) ("This court has not definitively stated the standard of review for the application of the doctrine of primary jurisdiction.  Since the district court can be affirmed under de novo review, it is not necessary to consider the possible application of the clearly erroneous standard." (internal citation omitted)).  In a subsequent decision, we stated "[t]his court *appears* to review primary jurisdiction de novo" but gave no analysis and made no express holding on the proper standard for review.  United States v. Henderson, 416 F.3d 686, 691 (8th Cir. 2005) (emphasis added).  In a more recent decision, we reviewed the issue of primary jurisdiction *de novo* but once again provided no analysis on the issue and made no reference to the disagreement among our sister courts.  See United States v. Rice, 605 F.3d 473, 475 (8th Cir. 2010).  Because the district court in Rice never had the opportunity to address the question of primary jurisdiction, and we found the doctrine to be inapplicable to that specific criminal case, we did not address the government's

-6-

argument that the issue should be reviewed for plain error. Appellants argue that <u>Rice</u> resolved the issue and controls here. We do not believe the Court in <u>Rice</u> intended to resolve a two-decade old circuit split without any analysis or without addressing this Court's prior hesitation to do so on two occasions. We think the better reading of the statement in <u>Rice</u> is that the Court simply reviewed the issue in that specific case *de novo* (it could not have done otherwise). Since we believe the district court in this case reached the correct conclusion even under a *de novo* review, we need not now decide the standard of review issue.

The doctrine of primary jurisdiction applies to claims "properly cognizable in court that contain some issue within the special competence of an administrative agency." <u>Reiter v. Cooper</u>, 507 U.S. 258, 268 (1993). "Under the doctrine of primary jurisdiction a court may leave an issue for agency determination when it involves the special expertise of the agency and would impact the uniformity of the regulated field." <u>DeBruce Grain</u>, 149 F.3d at 789. "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." <u>United States v. W. Pac. R.R. Co.</u>, 352 U.S. 59, 64 (1956).[5]

Appellants argue CP cannot, as a matter of law, override the requirements set forth by the PHMSA, which is a question of law that does not raise any issue within the STB's special expertise. They believe "[t]he DOT has exclusive jurisdiction regarding the specifications of the design, materials and construction of rail tank cars used to transport all hazardous materials in commerce." As such, "no circumstances exist that would allow the STB to overrule the DOT's edict that TIH materials can be

---

[5]Neither party disputes both the district court and the STB have jurisdiction to address Appellants' § 11101 claim. See <u>Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co.</u>, 215 F.3d 195, 197 (1st Cir. 2000).

transported in non-normalized steel rail cars safely and securely."  According to Appellants, "[t]o permit otherwise would allow the STB to collaterally attack the DOT's exclusive jurisdiction and subject the DOT regulations to an STB veto power."  The district court correctly found Appellants' arguments lacking.

Generally, a railway carrier is required to provide transport upon a reasonable request.  See 49 U.S.C. § 11101(a) ("A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall provide the transportation or service on reasonable request.").  As such, a railway carrier cannot outright refuse to transport TIH materials.  See Riffin v. Surface Transp. Bd., 733 F.3d 340, 346-48 (D.C. Cir. 2013); see also Radioactive Materials, M.-Kansas-Texas R.R. Co., 357 I.C.C. 458, 464 (1977) ("Moreover, a carrier may not assert before this Commission that, as a general proposition, shipments meeting DOT and NRC requirements are too hazardous to transport.  Such an assertion would amount to a collateral attack on the regulations of DOT and NRC.  Any attacks on the regulations of DOT or NRC should be brought before those agencies." (citation omitted)).  The question presented in this case, however, is not whether a carrier may refuse to transport TIH materials outright, but whether it may require criteria beyond those stated in the DOT regulations.

Although we have not had occasion to address this issue, two of our sister courts have concluded that the Interstate Commerce Commission ("ICC")—the predecessor agency to the STB[6]—has authority to review the imposition of requirements by carriers and railroads beyond those promulgated by the DOT in its regulations.  In Consolidated Rail Corp. v. Interstate Commerce Commission, 646 F.2d 642, 652 (D.C. Cir. 1981), the court held the ICC had the authority and jurisdiction to review the railroads' imposition of additional rates for the

---

[6]"In 1995, Congress enacted the ICC Termination Act (ICCTA), which abolished the 108-year-old Interstate Commerce Commission and substantially deregulated the rail and motor carrier industries."  Pejepscot Indus., 215 F.3d at 197.  "In the ICC's place, the ICCTA established the [STB] within the [DOT]."  Id.

transportation of radioactive materials.  In that case, the railroads sought to impose additional tariffs premised on the use of "special train service" ("STS") for the transportation of the dangerous materials.  Id. at 644-45.  The ICC held the tariffs were "unreasonably high" because the railroads failed to show the use of special trains was reasonable: "based on the evidence at hand, the special train requirement is wasteful transportation and an unreasonable practice in violation of Section 10701(a) of the act."  Id. at 645.  In affirming the ICC, the court considered and addressed the varying arguments regarding the scope of the railroad, the ICC, and the DOT's authority and jurisdiction to impose regulations and requirements for the transportation of such materials.  The railroads argued the ICC "lack[ed] authority to second-guess the railroads' 'rational judgment' on an 'operational' issue such as the need for STS."  Id. at 646.  The shippers argued the DOT had exclusive jurisdiction over the issue.  Id.  The ICC argued it "properly considered all available safety evidence to determine whether tariffs covering the cost of STS were reasonable."  Id.  The court explained that the ICC should "defer[] to the expertise and primary jurisdiction of the [Nuclear Regulatory Commission (NRC)] and DOT both in determining which particular measures are reasonably required to produce the necessary level of safety, and in deciding whether any particular safety measure will likely produce benefits commensurate with its cost . . ." but nevertheless held the "railroads may indeed seek to prove the *reasonableness of additional safety measures*."  Id. at 650 (emphasis added).  The court found the "safety regulations promulgated by DOT and NRC are entitled to be considered by the ICC as embodying prima facie the appropriate balance between safety and nuclear development," but did not exclude the possibility the railroads could satisfy their burden of showing the additional requirements were reasonable.  Id. at 651.

The Sixth Circuit reached a similar conclusion: a carrier "cannot refuse to haul any materials which meet (DOT and NRC) standards, but it may seek *approval* of a *stricter practice* which is shown to be just and reasonable."  Akron, Canton & Youngstown R.R. Co. v. Interstate Commerce Comm'n, 611 F.2d 1162, 1169 (6th Cir.

1979) (emphasis added). "[W]hile DOT and NRC have exclusive authority to promulgate Industry-wide standards for the carriage of radioactive materials, the ICC may allow Individual carriers to make more (but not less) stringent rules for their own carriage of hazardous materials." Id. at 1170. The STB has also suggested carriers may impose additional requirements. See, e.g., Union Pac. R.R. Co.–Petition for Declaratory Order, STB Fin. Docket No. 35219, 2009 WL 1630587, at *2 (S.T.B. June 11, 2009) ("[C]arriers are not precluded from seeking imposition of stricter safety standards . . . .").

Appellants have not cited us to any authority supporting their position and fail to meaningfully distinguish the prior case law. Their reliance on Louisville & Nashville Railroad Co. v. F.W. Cook Brewing Co., 223 U.S. 70 (1912) is entirely misplaced. In Louisville, the Supreme Court held the question of whether a railroad could refuse to transport intoxicating liquors, which were prohibited by state law, did not need to be presented to the ICC because there were no questions of fact to decide. Id. at 84. However, the Court was merely analyzing the legal question of whether a railroad could outright refuse (not reasonably limit) its transportation obligations pursuant to federal law based on a state law. Id. at 82. Furthermore, the Court specifically distinguished the case from one that would involve "the reasonableness of a rate[, which] . . . is primarily [a question] of administrative character, and the propriety of a prior resort to the Commission to obtain a ruling upon the question of reasonableness." Id. at 84. Here, we do not deal with an outright refusal to transport or with issues of competing state and federal regulations. While we recognize Appellants' argument that the STB's decision on this issue may have an impact on uniformity between railway carriers, the concern is better raised to the STB. Accordingly, we find the STB has the authority and jurisdiction to consider whether a carrier may impose a reasonable requirement beyond the minimum regulations set by the PHMSA.

Since we find CP's restrictions are not barred as a matter of law, we consider whether the question of reasonableness of the restrictions should be addressed by the district court or the STB. We believe the STB is better positioned to address the issue.

Determining whether any given transportation request is "reasonable" is no easy task. "Congress did not further elucidate the requisites of the common carrier obligations, leaving to the Commission and the courts the task of clarifying, on a case-by-case basis, a more precise definition of 'reasonable request' . . . ." Nat'l Grain & Feed Ass'n v. United States, 5 F.3d 306, 310 (8th Cir. 1993). Determining whether a request is reasonable is a complex, fact-intensive inquiry that requires knowledge and consideration of the industry at issue. The task is usually best left to the STB—the agency most experienced in evaluating the particular circumstances of each case. See Granite State Concrete Co. v. Surface Transp. Bd., 417 F.3d 85, 92 (1st Cir. 2005) ("The STB has been given broad discretion to conduct case-by-case fact-specific inquiries to give meaning to these terms, which are not self-defining, in the wide variety of factual circumstances encountered."). And in other cases where the central issue was reasonableness, this Court and others have applied the doctrine of primary jurisdiction to defer claims to the STB. See, e.g., DeBruce Grain, 149 F.3d at 789-90 ("The question of the reasonableness of a railroad's response to a shortage of cars [was] . . . one best left for agency resolution due to the need for specialized expertise and uniform national treatment."); Pejepscot Indus., 215 F.3d at 205 (holding referral to the STB under the doctrine of primary jurisdiction was appropriate for a claim that the defendants unlawfully refused to provide service on reasonable request).

The decisions discussed above not only demonstrate that the STB can consider requirements beyond the DOT regulations but also that the STB will usually be best equipped to determine if such additional requirements are "reasonable." Like the ICC, "promoting safe rail transportation is one of the [STB's] statutory

-11-

responsibilities." Consol. Rail Corp., 646 F.2d at 648.  No one would dispute that "[t]he railroads have a responsibility to protect their employees, their property and the public from harmful radiation" or other potentially toxic materials.  Id. (quoting the ICC).  It is the PHMSA's responsibility to balance the safety and economic concerns in the railroad industry and promulgate applicable regulations.  When it comes to determining if any requirements beyond those regulations are reasonable, the STB, with its expertise in the industry, is better equipped than federal courts to address fact-intensive questions of whether a particular safety requirement beyond the regulations is consistent with the regulations and national policy.

Determining the issue in this case will likely involve consideration of the benefits offered by the requirement, the impact it will have on the industry, and the technical comparison between normalized and non-normalized steel cars.  Given the complex economic and technical concerns raised by the entities objecting to the requirement of normalized steel cars in the consideration of the regulations, referral of this issue to the STB is appropriate.  See id. at 650 ("*The ICC* therefore properly defers to the expertise and primary jurisdiction of the NRC and DOT both in determining which particular measures are reasonably required to produce the necessary level of safety, and in deciding whether any particular safety measure will likely produce benefits commensurate with its cost and will be economical." (emphasis added) (footnote omitted)); Akron, 611 F.2d at 1170 ("*[T]he ICC* may allow Individual carriers to make more (but not less) stringent rules for their own carriage of hazardous materials." (emphasis added)).[7]  Additionally, unlike the district

---

[7]Appellants filed an unopposed motion to supplement the record before this Court with the petition (a matter of public record) by the Association of American Railroads to the PHMSA to mandate the phase out of non-normalized steel train cars for transporting TIH materials by no later than December 31, 2016.  Appellants' motion is granted.  We have considered the petition, which asserts that transporting TIH materials in non-normalized steel cars "poses an unnecessary risk to the general public" and that many shippers have already voluntarily retired such cars.  Its detailed

-12-

court, the STB can solicit comments from all interested parties and the DOT to address the issue from a more uniform perspective rather than merely the dispute between the parties in this case.  Moreover, a resolution by the STB would promote uniformity in the question of "reasonableness" rather than the potential of separate district courts reaching inconsistent resolutions in each individual case.

As in DeBruce Grain, "[a]ssessing the reasonableness . . . [of the requirements] in this case . . . would involve issues related to national rail policy, and a judicial ruling could affect rail transportation throughout the country." 149 F.3d at 789.  The analysis will require "'an informed evaluation of the economics [and] technology of the regulated industry,' which supports the invocation of primary jurisdiction." Id. (quoting Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 305 (1976)).  Therefore, we find the district court correctly applied the doctrine of primary jurisdiction and appropriately referred the issue to the STB.

B

Once a district court decides to refer an issue or claim to an administrative agency under the doctrine of primary jurisdiction, it may either dismiss or stay the action.  We review its decision on the issue for an abuse of discretion.  See Reiter, 507 U.S. at 268-69 (holding district court has discretion "either to retain jurisdiction or . . . to dismiss the case").  Appellants offer nothing beyond conclusory arguments and fall far short of demonstrating the without-prejudice dismissal was an abuse of discretion.

---

discussion of the capabilities and differences between normalized and non-normalized steel cars further reaffirms the complexity and technical nature of the question before the Court.

-13-

We believe the district court properly dismissed the action without prejudice. Staying the matter may have been appropriate if the district court was referring only a specific factual question to the expertise of the STB that was part of a claim, which would ultimately be decided by the district court.  In this instance, the STB's resolution of the referred issue will likely dispose of the entire case.  Moreover, Appellants offer no reason why they have suffered any prejudice based on the dismissal.  Therefore, the district court did not abuse its discretion in dismissing the action without prejudice.  See DeBruce Grain, 149 F.3d at 790 (finding "[d]ismissal without prejudice was appropriate since it did not disadvantage DeBruce" and the STB's decision could be appealed to this Court).

C

In considering the denial of a motion for a temporary restraining order and preliminary injunction, we "review the district court's factual findings for clear error, its legal conclusions de novo, and its exercise of equitable judgment for abuse of discretion."  Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).  "An abuse of discretion occurs where the district court fails to consider an important factor, gives significant weight to an irrelevant or improper factor, or commits a clear error of judgment in weighing those factors."  Id.

Appellants argue that even if the issue should be resolved by the STB rather than the district court, the district court erred in not granting injunctive relief to prohibit CP from imposing its requirement until after the STB has decided the issue.

In considering whether to issue a preliminary injunction, the district court must consider four factors:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties []; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest."  Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d

-14-

109, 114 (8th Cir. 1981) (en banc).  "The burden is on the movant to establish the need for a preliminary injunction . . . ."  DISH Network Serv. L.L.C. v. Laducer, 725 F.3d 877, 881 (8th Cir. 2013) (internal quotation marks omitted).  We find no error in the district court's denial of a preliminary injunction.

### 1 – Likelihood of Success

The primary argument for success advanced by Appellants is that CP cannot impose requirements beyond the regulations promulgated by the DOT.  Because we have already rejected this argument, we consider whether Appellants are likely to convince the STB the requirement CP seeks to impose is unreasonable.

The presumption that the DOT has appropriately balanced the safety and economic policy reasons in promulgating adequate regulations favors Appellants.  See Consol. Rail Corp., 646 F.2d at 652 ("[T]he safety regulations promulgated by DOT and NRC are entitled to be considered by the ICC as embodying prima facie the appropriate balance between safety and nuclear development.").  CP may rebut the presumption, for example, by showing

> DOT and NRC did not intend to establish comprehensive regulations to assure safe transportation of radioactive materials, but rather hoped that other agencies or private industry would substantially supplement their regulations; or else it might be shown that the regulations were drafted without any knowledge of the [relevant requirement]; or that the railroads lacked any meaningful opportunity to present the [relevant requirement] to DOT or NRC; or that some unusual or special conditions . . . made imposition of [the relevant requirement] reasonable in their case.

Id. at 651.  Here, the change of the PHMSA's position between the proposed and promulgated rules in 2009 suggests that the agency may have intended to apply the regulations as the minimum for safety standards.  CP argues that several indications

-15-

support such an inference. For instance, the agency repeatedly explained in its notice that it "continue[d] to believe that an accelerated phase out of these cars is justified," demonstrating it still believed there were safety reasons to require normalized steel cars. Moreover, it specifically noted "the voluntary efforts already underway by many fleet owners to phase out these cars, in many cases on schedules more aggressive than the five-year deadline proposed in the NPRM" as evidence for not *mandating* but merely *prioritizing* the retirement of such cars. Thus, CP asserts the agency continued to believe normalized steel cars were safer but found it unnecessary to impose stringent time lines since it appeared that the industry was voluntarily moving in that direction. These are at least plausible reasons to rebut the prima facie balance.

At this time, on the record before us, it is difficult to make an accurate prediction on the likely outcome before the STB. Indeed, this is precisely why referral to the STB was appropriate. For all of the reasons already discussed above, this task is best determined by the STB based on its expertise. Therefore, we find this factor does not favor either side.

### 2 – Threat of Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors, 563 F.3d at 319. "[L]oss of consumer goodwill can be irreparable harm," id., however, "[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered." DISH Network, 725 F.3d at 882. "[T]he absence of irreparable injury is by itself sufficient to defeat a motion for a preliminary injunction." Id.

Appellants argue they would suffer irreparable harm if required to ship TIH materials in normalized steel cars because they "will be forced to forego transporting

their product and receivers will be prevented from obtaining those products." Condensed, their argument is that the requirement will cease the shipment of TIH materials. But the only shipper who provided record evidence stated that only 31 of its 100 leased cars will not meet the requirement. Thus, at least sixty-nine percent of business for this shipper should remain unchanged. Appellants also submitted an affidavit estimating that twenty-one percent of the chlorine train cars in North America—responsible for twenty percent of chlorine shipments in North America—are non-normalized steel cars. This is a far cry from their assertion that no one will ship any products or that they will become unavailable. Additionally, CP introduced evidence that "approximately 95% of the TIH-lading cars on CP's railroad were constructed after 1989"—such that they would be made of normalized steel—and that "in the last five years, the amount of TIH lading moved by rail has decreased by 17%."

The district court found Appellants offered "remarkably little evidence" that the requirement would make it impossible to move TIH materials through the rail. Chlorine Inst., Inc. v. Soo Line R.R., No. 14-CV-1029 (PJS/SER), 2014 WL 2195180, at *6 (D. Minn. May 27, 2014). It noted Appellants failed to explain why they could not obtain a sufficient supply of normalized steel cars, particularly since these have been the standard since 1989 and should have been gradually replacing older cars, as dictated in the 2009 regulations. Id. The court also discredited their arguments because they failed to "give any indication that they have even *attempted* to find alternative ways to meet their needs for normalized-steel cars, much less explained their efforts and their success or lack of success." Id. In summary, Appellants failed to introduce sufficient probative evidence that they could not overcome any effective reduction in the eligible fleet by obtaining other tank cars that meet the requirement or shipping the cargo through other means. Moreover, we do not find record evidence that the shippers were at full capacity and using all of their fleet all the time. As such, even a reduced number of cars may be able to fully accommodate their shipping needs. Even assuming, however, that the shippers were

using all available train cars at all times, the evidence showed the reduction would not be particularly significant and the cargo could be moved by alternative means.

Appellants' assertion that "[a] rail car shortage . . . will inevitably result sooner rather than later" is too speculative. See, e.g., Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) ("In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." (internal quotation marks omitted)); S.J.W. ex rel Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction."). Merely demonstrating the "possibility of harm" is not enough. See Roudachevski v. All-American Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011). Appellants also assert that if CP is permitted to enforce this requirement, other railways may adopt it as well; but even if true, Appellants have failed to show it would result in irreparable harm. Finally, the district court properly recognized that any increase in costs or reduction in business as a result of requiring normalized steel cars would simply be compensable economic harm and does not constitute irreparable harm.

Accordingly, we find no likelihood of irreparable harm and this factor favors the denial of an injunction.

### 3 – Balance of Harms and Public Interest

Appellants argue CP is unlikely to suffer any harm if the injunction is granted because it merely returns the parties to their status quo prior to the effective date of the Tariff. However, they ignore the prior significant and devastating train derailments that have continued to occur in the past decade which initially prompted the discussions of mandating, more than six years ago, what CP now seeks to require. Requiring CP to transport TIH materials on its railways in contravention to a safety measure it voluntarily imposed, believing it to be necessary, could result in

-18-

devastating harm to both CP and the public should there be another derailment.  CP and the public both have interests in minimizing the risk and catastrophic effect of any potential derailments by providing for the safest possible transport of TIH materials.  Since we do not agree with Appellants that CP's requirement would amount to a national crisis for an adequate water supply or fertilizer for crops, any minimum reduction in the ability to transport TIH materials by rail does not outweigh the real concerns which prompted CP to implement the requirement.

We find these two factors also favor denying injunctive relief.  Accordingly, we hold the district court did not abuse its discretion in denying Appellants' request for injunctive relief.

### III

For the reasons above, the district court's order is affirmed in all respects.

_____